## SUN OIL CO. v. HOKE.

Nos. 31384, 31668. Jan. 29, 1946.

Rehearing Denied June 11, 1946.

*169 P. 2d 753.*

Swank & Swank, of Stillwater, and George H. Bowen, of Tulsa, for plaintiff in error.

Ralph B. Simcoe, of Stillwater, for defendant in error.

ARNOLD, J. These two appeals grew out of a trial and judgment in cause No. 14516 in the district court of Payne county. No. 31384 was lodged in this court April 13, 1943, by petition in error and case-made, while No. 31668 was lodged in this court November 12, 1943, by petition in error and transcript. On November 30, 1943, an order was entered by this court consolidating the two cases for disposition here. No. 31384 will be first considered, as it involves the merits as developed on the trial in the district court.

This action was commenced in the district court of Payne county by James T. Hoke against the Sun Oil Company, a corporation, and two other defendants. The defendant in error recovered judgment based on the verdict of the jury against plaintiff in error for the sum of $2,500. For convenience the parties will be hereafter designated as plaintiff and defendant as they appeared in the trial court.

Plaintiff in his petition alleged that he was the agricultural tenant in possession of the N.E. ¼ of section 1, township 19 north, range 5 east, Payne county, Okla.; that he was engaged in the business of raising livestock and particularly pure bred Hereford cattle; that his herd consisted of 90 head of pure bred registered Hereford cattle of varying ages and 115 head of pure bred Hampshire sheep; that he had a large fresh water pond on the premises that in its natural state provided an abundant supply of pure fresh water; that the defendant operated an oil and gas leasehold on the premises and was producing large quantities of oil, salt water and other deleterious substances from the ground; that in the operation of this lease defendant was negligent and careless in that it allowed large quantities of oil, salt water and other deleterious substances to escape and flow over the land into plaintiff's fresh water pond poisoning and polluting same; that his livestock drank said poisoned and polluted water and that he was damaged as a result thereof in the following particulars, towit:

| | |
|---|---|
| 2 dead steers, value $65.00 each | $ 130.00 |
| 1 dead heifer, value $80.00 | 80.00 |
| 40 cows injured, depreciation $85.00 each | 3,400.00 |
| 1 bull injured, depreciation | 150.00 |
| 21 steers injured, depreciation $40.00 each | 840.00 |
| 25 heifers injured, depreciation $45.00 each | 1,125.00 |
| 13 dead sheep, value $15.00 each | 195.00 |
| 102 sheep injured, depreciation $10.00 each | 1,020.00 |
| | $6,940.00 |

Defendant filed its answer, which was, in substance, a general denial containing specific allegations as follows:

That it has operated said leased premises for oil and gas without negligence, carefully and in accordance with the best practices known to the oil industry; that it kept the property in the best possible condition and has used no more of the surface of the land than was necessary in the development and operation of its oil and gas wells and in the saving, handling, and marketing of the oil and gas produced; that all of its operations were necessary and prosecuted in good faith; that if plaintiff's cattle or sheep were damaged, such damage or injury was occasioned by other causes than defendant's oil and gas operations, and that defendant did not in any way contribute to or cause such injury or damage.

Plaintiff filed reply and the cause was tried upon the issues thus presented.

In its petition in error defendant has made 13 assignments of error, but only

three propositions are presented and argued in the brief, as follows: First, failure of plaintiff to prove a cause of action; second, improper measure of damages as given in the trial court's instructions and failure of proof of damages; third, reversible error committed by the trial court and the plaintiff.

Defendant presents its first proposition in two subdivisions, as follows: First, plaintiff's whole theory and cause of action failed in the proof; second, no causal connection was proved.

Under the first subdivision of its first proposition defendant argues that because plaintiff's petition alleged damage and injury to his livestock by reason of drinking polluted water in the latter part of December, 1941, and the early part of January, 1942, while his proof is indefinite and uncertain as to the time when his livestock was poisoned by drinking the polluted water, while the proof of defendant is certain and definite as to the time of certain cleaning out operations which it made on its disposal well, which definitely fixed the only possible time of pollution as being February, that therefore plaintiff's theory of his case failed.

Apparently the waste matter from the producing wells flowed into earthen receiving pits and from there was pumped into what is called the input or disposal well, being Hoke No. 1. While defendant's proof is definite and certain by company records that the cleaning out of the input or disposal well commenced February 17, 1942, there is no definite proof as to how long the clogged or bridged condition of the disposal well was forming so that the cleaning out process became necessary.

Warren Stafford began work for plaintiff on these premises January 2, 1942, and it was his duty to look after feeding the cattle and sheep belonging to plaintiff. He testified that early in January some of the cattle became sick and he began an investigation to ascertain the cause thereof; that the fresh water pond froze over during this period and it was necessary for him to cut holes in the ice each morning so that the cattle could have access to water, and in his investigations he found that at the east end of the fresh water pond, some 200 yards from where he cut holes in the ice, the pond had not frozen; that he noticed a small flow of water into the pond at this point and after tasting and ascertaining that it was salt, he traced it back toward defendant's well; that he never saw the cattle or sheep drinking from this point in the pond where the water failed to freeze but that there were tracks about this place and he drew the impression that the livestock had drunk there when the lake was frozen elsewhere.

Plaintiff testified that after he learned of sickness among his stock he made complaint to the company about it; that thereafter on one occasion he had a conversation with Mr. Newton, defendant's field boss, and with Mr. Parkin, its superintendent, on the street in the town of Yale; that in this conversation he told them of the trouble he was having with his livestock; that during the conversation Mr. Parkin or Mr. Newton made this statement to him: "Jim, confidentially, what happened up there, our disposal well filled up and the salt water had no place to go except to go down to the big pond."

Mr. Newton was a witness for defendant and admitted this conversation between himself, Mr. Parkin, and the plaintiff in Yale but was not asked about and did not deny the statement attributed to him or Mr. Parkin by the plaintiff.

In reference to the condition of the receiving pits at the time of and before the cleaning out of the disposal well, he testified:

"Well, the pond was a little full and of course we didn't put any more water in it only what those small wells maybe two or three barrels a day and the pond was seeping a little but the other wells were not pumping and not making anything at all."

At another point in his direct examination the following appears:

"Q. This small amount of seepage, about how big an area did that extend over? A. Well that pond seeps along its full width of itself, a little but the seepage don't all run down the little ditch and it trickles down very slowly, and there is little holes where it is deeper than others, but where it went into the big pond it is very shallow and a very small amount of water."

On cross-examination he testified as follows:

"Q. How does the salt water get out? A. It seeps right through. Q. About as fast as you can put it in? A. Yes, sir. Q. As a matter of fact there is no one of the oil industry that has ever figured out a way to impound oil field salt water in earthen pits? A. It is hard to do. Q. It cannot be done? A. It is pretty hard to do."

Plaintiff further testified that in about two weeks after his conversation with Mr. Newton and Mr. Parkin in the town of Yale, he visited the leasehold and while there saw water running from defendant's premises down toward his pond and that it was salt water.

Upon this state of the record we think it cannot be said that there was a material variance or a failure of proof upon plaintiff's theory of the case. That the cattle and sheep became sick during the month of January or even in the latter part thereof or in February would not militate against the theory that they drank poisoned and polluted water in the latter part of December and the early part of January previous to the time of showing an effect therefrom.

What we have said as to defendant's contention under subdivision 1 and the testimony there reviewed is conclusive, we think, against defendant's contention under his second subdivision, that no causal connection was proved.

Under its second proposition defendant asserts a failure of proof of damage and an incorrect measure of damages as defined by the court in its instructions to the jury.

There is no dispute in the evidence that plaintiff lost three head of cattle and 13 head of sheep during the period covered by the testimony. Plaintiff testified to the reasonable cash market value of these dead animals and also to the depreciated condition of the balance of the herd from the first part of January to the middle of March, 1942. These cattle and sheep were placed on this pasture in the fall of 1941, and in December of that year their condition is described as "good" by several witnesses who saw them at that time. That those which did not die had greatly deteriorated in condition and value by the middle of March, 1942, is attested by the testimony of some seven or eight witnesses who were men of wide experience in the raising, buying, and selling of livestock. Many of them had had experience such as the plaintiff claims to have had. There is no serious contradiction to the testimony of these witnesses as to the condition of plaintiff's livestock during this period nor as to his having sustained appreciable loss and damage. Over the objections of plaintiff, defendant was permitted to exhibit before the jury moving pictures of plaintiff's cattle and sheep, which exhibition was intended to show a condition of the livestock at variance with the condition represented by the oral testimony of witnesses. It is now urged by defendant that this court should make some kind of order permitting the exhibition of these moving pictures before this court. Defendant had the benefit of this evidence before the jury and it may have entered into the jury's reduction of plaintiff's claim, the verdict being for much less than half of plaintiff's claim. However this may be, we know of no rule of appellate procedure which requires such an exhibition.

A sample of the water which drained into plaintiff's fresh water pond was taken at a point on the drain several feet from its entrance into the lake. This sample was submitted to Dr. V. G. Heller, chemist at the A. & M. College at Stillwater, and his report of its analysis was made by letter to the plaintiff in the following language:

"A partial analysis of the sample of water submitted for you by Judge Simcoe reveals that the water is slightly alkaline having a PH of 7.4. The total amount of soluble solids present amounts to 59,858 p.p.m. The chloride content of the soluble material calculated as sodium chloride amounts to 55,600 p.p.m. A considerable part of this chloride is present as calcium chloride."

On cross-examination with reference to this report of his analysis the following questions and answers appear:

"Q. Well, you testified on direct examination, did you not, that some of this water was harmful to cattle? A. Yes, sir. Q. Why did you conclude it was harmful to cattle? A. Our experiments show if a cow would drink a water such as this containing 58,000 parts per million, it would kill her, undoubtedly."

In view of the unquestioned fact that plaintiff lost three head of cattle and 13 head of sheep, the reasonable conclusions of experienced stock raisers as to the cause thereof and the cause of depreciation in the value of the balance of plaintiff's livestock, together with the admissions made by defendant's field boss, R. A. Newton, in reference to the escape of salt water through seepage from defendant's leasehold, we think it cannot be fairly asserted that there was a failure of proof of damage. A causal connection was shown between defendant's operations of this leasehold and the poisoning and polluting of plaintiff's fresh water pond resulting reasonably in the injury and damage claimed by plaintiff. That the deterioration in plaintiff's livestock could not have been the result of a hard winter and poor pasturage is shown by the undisputed testimony of several witnesses that they had feed before them at all times. Plaintiff's employee, Stafford, testified that he fed them two pounds of meal per head and plenty of hay every day.

In the case of Phillips Petroleum Co. v. Bartmess, 181 Okla. 501, 76 P. 2d 352, this court used this language in the syllabus:

"An oil and gas lessee engaged in the operation of an oil and gas well on leased premises, but not having the right to control the surface or agricultural rights in the premises, is liable for damages to cattle of one in possession of the surface grazing rights covering the same land where the injury to the cattle and resulting damage was caused by the cattle drinking salt water which had been permitted by the oil and gas lessee to flow over the surface of the land."

Gulf Refining Co. v. Carruthers, 190 Okla. 61, 120 P. 2d 991, is to the same effect, the second paragraph of the syllabus reading:

"Where, in an action to recover damages for injury to cattle, there is competent evidence tending to prove the injury, the cause, nature and extent thereof, and there is also competent evidence tending to prove the market value of the cattle immediately before and after the alleged injury, it is for the jury to fix the amount of the injury, not to exceed a sum greater than the proven difference between the two values stated."

Defendant's insistence that an improper measure of damages was submitted to the jury in the court's instructions is based on an excerpt taken from C. J., vol. 17, page 880, as follows:

"Where the injury to the animal is not permanent but is curable by a reasonable effort, the measure of damages is just compensation for the time and labor laid out and expended in effecting a cure, together with the loss of the use or produce of the animal during the period of disability."

Defendant argues that this measure of damages is a proper one but that it has never been considered and passed upon by this court. The argument is interesting but is largely abstruse when it is considered that the authenticity of the rule announced by Corpus Juris is derived from cases involving the beating, maiming, or shooting of domestic animals such as horses and dairy cows where their usable value or the value of their produce is susceptible of computation, and the expense of treating and restoring them to normal condition is capable of proof.

The measure of damages in this case as defined and explained to the jury reads as follows:

"If you find your verdict for the plaintiff in this case, the measure of his damages will be as follows:

"For the loss of cattle and sheep which died, as a proximate result of the drinking of the polluted waters, if any you find so died, the reasonable market value of such sheep and cattle at the time of such injury.

"For the damage and depreciation in value of cattle or sheep as a proximate result of drinking polluted waters, if any you find were so injured and damaged, the difference, if any, in the reasonable market value of such cattle or sheep immediately before and the reasonable market value after such injury, and in determining the reasonable market value after such injury and damage, if any you find, you may take into consideration the nature and extent of such injury, whether or not the same was permanent or temporary and any other fact or circumstance in proof in the case tending to show such reasonable market value.

"Your verdict in no event to exceed $6,940.00, the amount sued for."

In the case of Deep Rock Oil Corporation v. Griffeth, 177 Okla. 208, 58 P. 2d 323, the first and second paragraphs of the syllabus read:

"The measure of damages for the loss of cattle that die as a result of drinking water from a polluted stream is the reasonable market value of said cattle at the time of injury."

"Where cattle are damaged and depreciated in value as a result of drinking water from a polluted stream, the measure of damages is the difference between the reasonable market value of said cattle immediately prior to and subsequent to the injury."

Announcing the same rule are the following: Devonian Oil Corp. v. Hurt, 169 Okla. 114, 36 P. 2d 24; Darby Petroleum Co. v. Rogers, 183 Okla. 415, 82 P. 2d 839.

Under defendant's third proposition the contention is made that the trial court committed reversible error in refusing to give defendant's requested instruction submitting interrogatories to the jury to be answered in reference to the number and value of the cattle and sheep which died, the number and extent of injury to the cattle permanently injured and the amount allowed by the verdict for same, and how many of the cattle recovered and the amount allowed by the verdict for their temporary injury; the same questions were submitted as to the sheep.

The giving or refusing of requested instructions submitting interrogatories to be answered by a jury is a matter of discretion with the trial court. Constitution, art. 7, sec. 21, reads:

"In all jury trials the jury shall return a general verdict, and no law in force, nor any law hereafter enacted, shall require the court to direct the jury to make findings on particular questions of fact, but the court may, in its discretion, direct such special findings."

In support of its contention on this question defendant has cited several decisions by this court, but an examination of these cases discloses that they were either actions for damage to land where the claim was for both temporary and permanent damage or were actions in which there were two or more causes of action. In the instant case there was only one cause of action, viz., the poisoning and polluting of plaintiff's fresh water pond by salt water and other deleterious substances permitted to escape from defendant's leasehold. The injury and damage claimed by plaintiff was the result of this one continuing act. It cannot be said in this case that the refusal of the trial court to submit the interrogatories to the jury was an abuse of discretion resulting in prejudice to the defendant. Plaintiff's claim of injury and damage amounted to $6,940, while the verdict of the jury was for $2,500.

In No. 31688 a petition for a new trial based upon newly discovered evidence

was filed in the trial court June 15, 1943, long after the appeal on the merits had been lodged in this court. The trial court dismissed the petition for a new trial. The alleged error of the trial court in dismissing the petition for new trial is not briefed and the defendant is deemed to have waived any error in the action of the trial court in this respect.

Upon the merits of the case the judgment of the trial court in No. 31384 based upon the verdict of the jury is affirmed, and its dismissal of cause No. 31668 is for the foregoing reason affirmed.

HURST, V. C. J., and RILEY, OSBORN, WELCH, and DAVISON, JJ., concur. CORN, J., concurs in result. GIBSON, C.J., and BAYLESS, J., dissent.