No. 19,488.

THE STATE OF COLORADO AND STATE AGRICULTURAL COMMISSION *v*. EARL G. MORISON, ET AL.

(365 P. [2d] 266)

Decided October 2, 1961.

Mr. Duke W. Dunbar, Attorney General, Mr. Frank E. Hickey, Deputy, Mr. Clifton A. Flowers, Assistant, for plaintiffs in error.

Mr. Ray A. Gunning, for defendants in error.

*En Banc.*

Mr. Justice McWilliams delivered the opinion of the Court.

The General Assembly in 1957 enacted the following: "HOUSE BILL NO. 469

"AN ACT GRANTING TO EARL G. MORISON AND OPAL P. MORISON THE RIGHT TO BRING AN ACTION AGAINST THE STATE OF COLORADO FOR THE ALLEGED LOSS OF THEIR DAIRY HERD, COWS PURCHASED AND RESULTANT DAMAGES.

"*Be It Enacted by the General Assembly of the State of Colorado:*

"SECTION 1. *Right granted to bring civil action.* The right is hereby granted to Earl G. Morison and Opal P. Morison of Rural Route 3, Longmont, Colorado, to bring a civil action in the proper district court of the state of Colorado, for the purpose of determining whether the alleged loss of their dairy herd, cows purchased and resultant damages were due to the negligence of the State of Colorado, or any of its departments, commissions, offices, agents, employees or contractors and, if any such damages were caused by such negligence, then of determining the amount of such damages.

"SECTION 2. *Limitation and procedure.* Such action shall be begun within one year from the effective date of this Act, and shall be conducted in all respects in accordance with the Rules of Civil Procedure and the laws of the state of Colorado applicable to actions for damages to personal property. In such action the state of Colorado shall have all the rights to which any other defendant would be entitled in an action of such nature.

"SECTION 3. *Safety Clause.* The General Assembly hereby finds, determines and declares that this Act is necessary for the immediate preservation of the public peace, health and safety.

"Approved: April 30, 1957."

Pursuant to this so-called relief bill, Earl G. Morison and his wife, Opal P., brought the present action against the State of Colorado and the State Agricultural Commission. In their amended complaint the Morisons alleged that the defendants, acting by and through their agent, one J. W. Childs, then the State Veterinarian, "did negligently, carelessly, wrongfully and unlawfully per-

form their duty to use proper steps to prevent the spread of contagious and infectious disease" in livestock and cattle and specifically that on or about February 11, 1956, the defendants "did fail to properly and carefully inspect and test said cattle prior to" their sale to the Morisons, all with "resulting damage to the plaintiffs herein."

In view of the ultimate disposition of this writ of error it is deemed advisable to itemize the damages sought by the Morisons. The Morisons prayed for damages in the total amount of $71,325.98, which sum is broken down as follows: (1) $2,775.98 for damages to the Morison herd which became "infected, sick and disordered" with paratuberculosis as a result of defendants' negligence: (2) $15,000 representing "lost past and future income from the production of dairy products from said cattle"; (3) $5,000 because "plaintiffs were deprived from the increase in breeding cows and calves"; (4) $6,600 because "plaintiffs were deprived of dairy products and beef for past and future consumption of themselves and their children"; (5) $15,000 because "plaintiffs' dairy farm became infested and contaminated with bacteria causing said Johne's disease"; (6) $1,600 because "plaintiffs lost the use and value of silage and feed for said cattle"; (7) $350 because "plaintiffs lost the use and value of milking equipment and fixtures"; and (8) $25,000 because "plaintiffs suffered great distress and anguish of mind, and loss of time and effort." Thereafter the trial court on appropriate motion struck the last item of claimed damage and the prayer was thereby reduced to $46,-325.98. By answer the State of Colorado and its Agricultural Commission denied all of the material allegations of the amended complaint.

Upon trial the jury returned a verdict for the Morisons in the amount of $20,933.66. Defendants' motion to set aside this verdict or for new trial was denied and judgment entered on the verdict.

Defendants' numerous assignments of error can be

grouped as follows: (1) that the State of Colorado is not liable for the tortious acts or omissions of its officers or agents; (2) that the Morisons failed to make out a prima facie case of negligence on the part of the defendants or its agents; (3) that the jury was inadequately and erroneously instructed as to the proper measure of damages.

This Court has repeatedly held, though not always with unanimity, that without its consent the State cannot be sued or become liable for the tortious acts of its agents or officers. In support of this doctrine of sovereign immunity, see *Liber v. Flor,* 143 Colo. 205, 353 P. (2d) 590; *Faber v. State,* 143 Colo. 240, 353 P. (2d) 609, and *Berger v. Department of Highways,* 143 Colo. 246, 353 P. (2d) 612.

However, if the State gives its consent, then it may become liable for the negligent acts or omissions of its officers and agents. 81 C.J.S. p. 1139 states:

"The legislature may waive the state's exemption from liability for its torts or the torts of its officers and agents, and prescribe conditions of recovery, but an intent to do so must be manifested in clear and unambiguous language. The waiver merely removes a bar to liability and does not create a liability where none existed."

See also, 49 Am. Jur. p. 289; *In Re Benedictine Sisters' Bill,* 21 Colo. 69, 39 Pac. 1088; and *Board of County Commissioners of El Paso County v. City of Colorado Springs,* 66 Colo. 111, 180 Pac. 301. It should be noted that we are here concerned with actions ex delicto, not ex contractu.

In *McCrossen v. State,* 101 N.Y.S. (2d) 591, it was held that the statutory waiver of sovereign immunity not only waives the State's immunity to suit and liability but also makes applicable the rule of respondeat superior to all officers, servants, agents and employees of the state.

By House Bill No. 469 the General Assembly purported to give "legislative authority" and consent to

an action against the State to determine if the Morisons suffered any damage from any negligence on the part of the State or any of its departments or agents. We now hold that the language used in House Bill No. 469 is sufficiently broad to the end that the State of Colorado acting through its legislative body gave its unqualified consent to the maintenance of the present action, and defendants' contention that notwithstanding this legislative authority the State is still not liable for the tortious acts, if any, of its departments and agents is without merit.

It is next strongly urged that the Morisons failed to make a prima facie showing that the defendants or any of its agents were in fact negligent. Careful examination of the voluminous record convinces us that there is ample evidence tending to show negligence on the part of one Dr. J. W. Childs, who at all times pertinent to this case was the State Veterinarian and as such an admitted agent for the State Agricultural Commission. True, there was evidence offered by the defendants which tended to rebut or contradict the Morisons' evidence in this regard, but this presented nothing more than a disputed issue of fact properly to be resolved by the jury. See *Yockey Trucking Company v. Handy*, 128 Colo. 404, 262 P. (2d) 930, and *Gray v. Turner*, 142 Colo. 340, 350 P. (2d) 1043. In order to demonstrate that the issue of negligence on the part of these defendants was properly submitted to the jury it becomes necessary to review the evidence in some detail.

In the late summer of 1954 one John D. Clouse bought a dairy farm, situate in Larimer County, together with some 98 head of dairy cows. About this time he also shipped in from Indiana an additional 35 head of dairy cattle. There was evidence of a substantial nature that these 35 head of cattle when unloaded in Larimer County were in extremely poor condition and that they were brought into this state in violation of the statute which requires a certificate showing such cattle to be

free of contagious disease. In October, 1954, two cows from the Clouse herd were sent to slaughter in Denver, and upon clinical examination were found to have paratuberculosis, sometimes called Johne's disease.

Paratuberculosis is a "chronic, insidious disease" of cattle that generally affects the "mucosa of the intestinal tract" and is accompanied by extreme diarrhea. Animals which contract this disease lose weight, are "extremely rough" and in aggravated cases death results. The disease is contagious and is carried by the fecal material from the infected animal which in turn contaminates the feed of an uninfected animal.

As a result of the clinical determination that two of the Clouse herd had paratuberculosis, Dr. N. M. Riemenschneider, who was then the State Veterinarian, pursuant to instructions from the State Agricultural Commission, placed a quarantine on the entire Clouse herd. The expert witnesses all agreed that the only certain method of ascertaining whether a particular cow had paratuberculosis is to slaughter the cow and conduct a clinical examination of the tissues. Such a method of examination has some inherent and obvious disadvantages. A test which does not require the killing of an animal is the so-called Johin test. The Johin test involves injecting a serum intradermally into the caudal fold of the bovine. If the caudal fold thereafter remains normal, the suspected animal is free from paratuberculosis. But if there be a swelling in the caudal fold, it indicates that the animal does have paratuberculosis. All of the experts agree that the so-called Johin test was unsatisfactory in the sense that it was unreliable and subject to error, but that nevertheless it was as of that time the only testing method available, short of killing the animal and conducting a clinical. test. A Johin test run on the entire Clouse herd in November, 1954, proved negative. In June, 1955, Dr. J. W. Childs, who succeeded Dr. Riemenschneider as the State Veterinarian, ran a second Johin test on the entire Clouse herd, which also

proved negative. There was expert opinion to the effect that two "negative" Johin tests justified the conclusion that the herd was free of paratuberculosis, although it was also agreed that under certain circumstances additional tests might well be in order. Regardless of this minor dispute, in the instant case the quarantine of the Clouse herd was lifted in June, 1955.

The Morisons base their charge of negligence on the fact that *subsequent* to June, 1955, the Clouse herd continued to show the symptoms of paratuberculosis, that such was called to the attention of the state veterinarian, and that he refused to act when he had a *duty* to do so. In support thereof, the Morisons called numerous witnesses who uniformly agreed that the sanitary conditions at the Clouse farm were "terrible" and that the premises were filthy beyond verbal description and that during the last half of 1955 the physical condition of the entire Clouse herd rapidly went from bad to worse. This sad state of affairs was repeatedly called to the attention of Dr. Childs, who did nothing. It was his position that inasmuch as he had run the two Johin tests, each of which proved negative, that ended the matter. This was his continuing attitude for the balance of 1955 and through February, 1956, at which time the Clouse herd was sold at a dispersal sale. And his attitude remained unchanged notwithstanding repeated pleas, requests, and even orders from his superior in the Department of Agriculture that he conduct additional tests to determine whether the Clouse herd was in fact free from paratuberculosis. The record discloses that the Clouse herd became a cause celebré and there was even a division of thought within the Department of Agriculture. Notwithstanding the fact that one Louis R. Burke, chief of the Division of Animal Industry with the Colorado Department of Agriculture, "ordered" Dr. Childs, who incidentally was under his (Burke's) supervision, to retest the Clouse herd, Dr. Childs remained adamant and declined to follow this direction.

In February 1956 when it became generally known that Clouse intended to sell at a public sale his entire herd, these requests for a retesting became more numerous. But nothing was done by Dr. Childs, except to write a letter to Clouse wherein he stated that the Clouse herd had been tested in November 1954 and June 1955 for paratuberculosis and found to be free of the disease. The reason for this letter was the obvious desire of Clouse to in some manner allay any suspicion that his herd was infected with paratuberculosis and to thereby facilitate his dispersal sale.

To assist in establishing negligence on the part of Dr. Childs, the Morisons contend that Dr. Childs breached certain duties thrust upon him by statute, and that his violation of a statutory duty constituted negligence. In this regard see C.R.S. '53, 8-5-9, 15 and 18, which in general provide that when the State Agricultural Commission is apprised of the fact that a contagious disease exists among cattle "it shall be the *duty* of the said State Agricultural Commission to take such steps as will prevent the spread of such disease within the state." Also, the State Veterinarian, when he is suspicious of the presence of a contagious disease in livestock, but is unable to positively establish this fact, is empowered to kill the animal and conduct a post mortem examination. It is argued that these statutes have particular applicability when it is known that a herd suspected of having a contagious disease is about to be sold at a dispersal sale. These statutes were designed to protect not only the general public but also a class of persons of which the Morisons were members, i.e., cattle owners and the purchasers of cattle sold at a public sale. Accordingly, they may quite properly rely on these statutes in their effort to show defendants' negligence.

■ Recognizing that much of the evidence recited above was in dispute and contradicted, we nonetheless hold that the Morisons did make out a prima facie case of negligence on the part of these defendants and their

agent, Dr. Childs, and the trial court properly submitted this disputed issue to the jury.

At the dispersal sale held on February 11, 1956, the Morisons bought four dairy cows from the Clouse herd. It was established by competent evidence that in fact the Clouse herd as of the date of this sale was *not* free from paratuberculosis, but in fact was thoroughly infected with the disease. Specifically, the Morisons showed that the disease was present in at least some of the four dairy cows purchased by them at the Clouse sale and that thereafter the rest of their herd, consisting of some 16 other dairy cows, and four heifer calves, was exposed to the disease and in fact contracted it.

When a herd is infected with paratuberculosis, two alternative routes are available to the owner. He may try to "live with" his problem, attempt to isolate the infected cattle, and in general try to stamp out the disease. The evidence was that this was always a frustrating and often a losing battle. The other alternative is for the owner of the infected herd to sell the cattle, take his loss, disinfect the barns and farm in general, and then start over. The Morisons took this latter route, although they apparently have been discouraged to the extent that they have never elected to re-engage in the dairy business.

It is finally urged that the trial court erred in failing to fully and correctly instruct the jury as to the measure of damages. Four instructions relating to the general issue of damages were given to the jury, the net effect of which was to inadequately apprise the jury as to the specific items to be considered in assessing damages. Instruction No. 1 specifically enumerated all of the particular items of damage mentioned by the Morisons in their complaint, except for: (1) the claim for $25,000 for mental anguish which was stricken by the trial court on appropriate motion, and (2) the claim for $15,000 for depreciated value of the dairy farm. By Instruction No. 5 the jury was told that they should award "fair and

just compensation for the loss sustained to the personal property of plaintiffs and losses arising from the damage to such personal property." Instruction No. 7 permitted the jury to award the Morisons a sum representing loss of profits resulting from "defendants' wrong, if any." Instructions numbered 8 and 9 were general in nature, and respectively advised the jury that the Morisons had the duty to mitigate their damages and that the mere fact that the exact or precise *amount* of damages is uncertain or difficult to ascertain does not preclude recovery by the Morisons. Also in Instruction No. 9 the jury was specifically instructed that the Morisons should *not* be allowed any damages for the alleged "loss of value of the plaintiffs' real estate." In this latter regard the trial court was correct and the Morisons' contention that such constitutes error is without merit. There was no competent evidence that there was any *permanent* diminution in the value of the farm. The farm could at no great expense be disinfected and ready for reoperation as a dairy farm.

Defendants' duly objected to Instruction No. 5 on the ground that it did not adequately advise the jury as to the measure of damages, and to Instruction No. 7 on the grounds that such incorrectly permitted the jury to award the Morisons a sum for alleged loss of profits, both past and future. Defendants did *not* tender instructions which reflected their concept of a correct instruction as to the measure of damages, and in this sense they were not as helpful to the trial court as perhaps they might have been. Be that as it may, the trial court has an inescapable responsibility to make certain that the jury is properly instructed as to the measure of damages, and the duty remains whether counsel bring the matter to the attention of the court by proper objections or by tendering correct instructions on the subject. In *Kendall v. Hargrave,* 142 Colo. 120, 349 P. (2d) 993, we said:

"While, as observed above, neither party objected to any of the instructions given, and neither appears to

have tendered an instruction on the measure of damages, it was nevertheless necessary that the jury be properly and fully instructed on that question, and counsel for the parties having failed in this respect, the trial court on its own motion should have done so."

In short, the jury was inadequately instructed as to the correct measure of damages, and a new trial on this one issue only is therefore required. Some comment as to the proper measure of damages is deemed advisable to the end that error in this respect will not be repeated. The instructions on retrial should be in accord with the following general observations.

■ Where a farm animal is killed by the negligent acts of another, the owner is entitled to the fair market value of the animal as of the date of death. Where a farm animal is injured, but not killed, the true measure of damages is the difference between the fair market value of the animal before the injury and its fair market value immediately after the injury. In the instant case the Morisons are entitled to a sum equal to the difference between the fair market value of the herd *before* it contracted paratuberculosis and its fair market value *after* it became infected with the disease. The evidence in this regard tended to show that the value of the herd before the injury was approximately $4,000 and that the diminution in value was only about $2,775.98, and did not even approximate the verdict of the jury which was $20,933.99.

■ Additionally, the Morisons are admittedly entitled to such special damages as they are able to show with reasonable certainty resulted from defendants' negligence. This would include loss of profits due to diminished milk production from the cows *before* their sale; the value of silage or feed that became contaminated and therefore unusable; and the reasonable cost of disinfecting the milking equipment, barn facilities, and the farm in general.

■ However, the Morisons are *not* entitled to be

awarded any sum representing loss of profits for the dairy operation from and after the date of the sale of their diseased cows. Nor are they entitled to be compensated for the loss of the progeny which they could reasonably have expected from the cows. Having received the diminution in their market value to allow these additional items would be a form of double recovery. In other words, fair market value itself reflects, inter alia, the fact that the farm animal may have income producing ability, including the ability to propagate. In support of the foregoing, see *Covey v. Western Tank Lines,* 36 Wash. (2d) 381, 218 P. (2d) 322, wherein the owner of five mink used for breeding purposes was limited to the fair market value of the lost mink. In so holding the Supreme Court of Washington said:

"The measure of damages for the loss or destruction of personal property is ordinarily its market value, if it has a market value. * * * This measure of damages applies in the case of loss or destruction of animals. * * * It follows that an allowance of this claimed market value compensates the owner for all use he would have made of the animals for breeding purposes. * * *."

See, also, 3 C.J.S. Animals, section 234, 25 C.J.S. p. 627; *Larimer & Weld Irrigation Co. v. Landers,* 26 C.A. 1, 141 Pac. 517; *Colvin v. John Powell & Company,* 163 Nebr. 112, 77 N.W. (2d) 900; *Sun Oil Co. v. Hoke,* 197 Okla. 261, 169 P. (2d) 753; and *Wilcox Oil Company v. Walters* (Okla.), 284 P. (2d) 726.

The judgment is therefore reversed and the cause remanded for a new trial on the issue of damages only, such trial to be consonant with the views herein expressed.

Mr. Justice Frantz concurs in the result.