**F I L E D**

PUBLISH

UNITED STATES COURT OF APPEALS

TENND CIRCUIT

PROTECTORS INSURANCE SERVICE, INC.,
a Colorado corporation,

Plaintiff-Appellee,

v.

No. 96-1399

UNITED STATES FIDELITY & GUARANTY COMPANY,
a Maryland Corporation; FIDELITY & GUARANTY
INSURANCE UNDERWRITERS, INC., an Ohio
corporation; and FIDELITY & GUARANTY INSURANCE
COMPANY, an Iowa corporation,

Defendants-Appellants.

Appeal from the United States District Court
District of Colorado
(D.C. No. 94-B-2669)

Bruce A. Menk, Hall & Evans, LLC, Denver, Colorado (Alan Epstein of
the same firm, and Mark Holtschneider, USF&G, Baltimore, Maryland,
with him on the briefs), for appellants.

Gerald P. McDermott, McDermott & Hansen, Denver, Colorado, for
appellee.

Before BALDOCK and BRORBY, Circuit Judges, and BROWN,* District
Judge.

BROWN, District Judge.

* The Honorable Wesley E. Brown, Senior District Judge, United
States District Court for the District of Kansas, sitting by
designation.

The defendants (hereinafter "USF&G") appeal a jury verdict in

plaintiff's favor totaling $844,650.00.  The jury found that USF&G

breached a contract with plaintiff and that, as a result, plaintiff lost future profits in the amount of $809,650.00 and received $35,000.00 less than fair market value upon the sale of its business. On appeal, USF&G concedes liability for breaching the contract, but argues that the lost profits award should be vacated because it represents an impermissible double recovery. In the alternative, USF&G argues that the evidence was insufficient to support an award of lost profits. The jurisdiction of the district court was founded upon 28 U.S.C. § 1332(a); we have jurisdiction pursuant to 28 U.S.C. § 1291. The parties agree that the law of Colorado governs this contract dispute. See New York Life Ins. Co. v. K N Energy, Inc., 80 F.3d 405, 409 (10th Cir. 1996) (federal court sitting in diversity must apply the substantive law of the forum state).

Summary of Facts.

The plaintiff, a Colorado corporation, was an insurance agency formed in 1979. The sole owner of plaintiff's corporate stock was Earl Colglazier. Plaintiff was an agent of USF&G and had a written contract authorizing it to solicit and submit applications for USF&G insurance. If the applications were accepted, plaintiff would be paid a commission by USF&G. Although plaintiff was an independent agency, it had contracts with only two insurance carriers; thus, over 80% of the insurance it sold from 1979 to 1992 was USF&G business. Insofar as termination of the agency agreement

2

between plaintiff and USF&G was concerned, the contract stated that the parties "agree to make a good faith effort to provide for rehabilitation and thereby avoid termination of this Agreement."

In March of 1992, USF&G notified Colglazier that because of profitability concerns it was establishing a formal rehabilitation program for plaintiff. The program set a goal of achieving certain "earned loss ratios" (which measure the agent's profitability to the insurance company) in plaintiff's commercial and personal lines of insurance in 1992. In October of 1992, USF&G notified Colglazier that it was going to terminate its personal lines contract with plaintiff in 180 days if the goals of the rehabilitation program were not met by the end of 1992. The letter stated that after May 1, 1993, USF&G would not accept any new personal lines business and would nonrenew the current business. In response, Colglazier wrote USF&G and asserted that his personal and commercial accounts were intertwined and that terminating the personal lines, although only 20% of his sales, would effectively put him out of business. Faced with this situation, Colglazier decided to sell all of plaintiff's assets, including the rights, title and interest on its insurance policies, to Centennial Agency, Inc., on January 1, 1993. The purchase agreement called for plaintiff to receive cash payments of slightly over $148,000.00.[1]

---

[1] The principal owner of Centennial, Mark Swanson, is the brother of David Swanson, the USF&G special agent that was assigned to work on plaintiff's rehabilitation. After the sale, David

Plaintiff later brought this suit alleging that USF&G breached the contract by not making a good faith effort at rehabilitation to avoid termination of the agreement. For our purposes it suffices to say that the jury could reasonably find from the evidence that USF&G breached the agreement by improperly measuring plaintiff's loss ratios, by unfairly changing the goals and criteria of the rehabilitation program, and/or by certain other arbitrary actions.

With respect to damages, plaintiff presented the testimony of John Putnam, an expert in valuation of insurance agencies. Putnam testified that plaintiff's business was sold at a "distressed" price because of the circumstances under which it was sold, including time pressure to make a sale and USF&G's stated intention of terminating the agency's personal lines insurance. Putnam testified that the agency would have been worth approximately $175,000 had it not been sold under distress. Aplt. App. at 226. Putnam arrived at this value by using three different methods: a multiple of revenues, a price/earnings ratio, and a capitalization of earnings. Id. at 254. In addition to this evidence, Earl Colglazier testified that he would have continued to operate the agency for at least ten more years had USF&G not given him the termination notice. Plaintiff also presented rather confusing

Swanson left his job and joined his brother's agency, becoming the agent responsible for plaintiff's former book of business. Aple. Supp.App. at 49.

4

evidence with respect to its net profits in the years before the sale. According to Colglazier's testimony, Protectors Insurance Service was operated in conjunction with a company called Protectors Management Service, which conducted "all of the office insurance activities, salary, payroll, paying everybody on behalf of Protectors Insurance Service." Aplt. App. at 72. The returns of Protectors Insurance Service showed reported net income in the years before the sale ranging from a low of about $36,000 to a high of about $84,000, with an average of about $59,000. Plaintiff argues that the returns of Protectors Management Service show that plaintiff's net income was actually higher than this. Defendant, on the other hand, argues that the combined returns of the two companies show that plaintiff made under $2,000 in 1991 and lost over $17,000 in 1992.

The district court instructed the jury with respect to damages as follows:

> To the extent that actual damages have been proved by the evidence you shall award as actual damages:
>
> 1. The amount of net income and earnings the Plaintiff ... would have earned if the Defendants had not breached the contract; and
>
> 2. The amount which is the difference between the price the Plaintiff ... received for the sale of the agency's business and the reasonable sale value of the agency's business if the Defendants had not breached the contract...."

Aplt. App. at 41. USF&G objected to this instruction, arguing that

5

it permitted plaintiff to obtain a double recovery because the reasonable sale value of the agency was based on the agency's ability to earn future profits and, thus, plaintiff would be compensated twice if it received lost profits on top of the sale price. The district court rejected this, finding that the two items were distinct because the sale value in 1992 was a "snapshot in time" that did not include lost future profits. Aplt. App. at 60. As indicated previously, the jury returned a special verdict finding $809,650 in lost profits and a $35,000 difference between the actual sale price of the agency and its reasonable sale value.

Discussion.

USF&G first argues that the district court's damage instruction was erroneous because it permitted the plaintiff to obtain a double recovery. We agree. In a breach of contract action, the objective is to place the injured party in the same position it would have been in but for the breach. McDonald's Corp. v. Brentwood Center, 942 P.2d 1308, 1310 (Colo.App. 1997). A double or duplicative recovery for a single injury, however, is invalid. Westric Battery Co. v. Standard Elec. Co., 482 F.2d 1307, 1317 (10th Cir. 1973). Plaintiff contends there was no double recovery here because "[t]he record is devoid of any factual basis for believing that the damages for the decreased sales price are based upon or included future lost profits." Aple. Br. at 30. This assertion is contradicted both by the record and by common

6

sense.  The testimony of plaintiff's expert, John Putnam, shows that his determination of the reasonable sale value of the agency was based largely -- if not entirely -- upon the agency's ability to generate future profits.  His testimony makes clear that the value of an agency to a buyer is determined from its potential to generate a future income stream.  See e.g., Aplt. App. at 226.  Putnam conceded that all of the methods he used to determine value took into account the agency's ability to generate future profits.  Aplt. App. at 254.  When asked what the reasonable sale price of the agency's business would have been but for the distress factors brought about by the defendant, Putnam replied:

> Well, at the time that it was sold, you know, based upon income, because to a large degree this is what we all — and I am talking about commission revenue, what kind of income is coming into the agency, what kind of expenses they had.  In my opinion the agency was worth approximately $175,000 at the time that it was sold had it not been sold under duress or distress.

Aplt. App. at 228.

We agree with USF&G that Albrecht v. The Herald Co., 452 F.2d 124 (8th Cir. 1971), although it is not controlling in this diversity action, is analogous to the situation  before us.  In Albrecht, the plaintiff was a contract carrier for a newspaper publisher.  After plaintiff charged the subscribers on his route a greater price than the suggested retail price of the publisher, the publisher began competing directly with the plaintiff on his own

7

route. As a result of defendant's actions, plaintiff was forced to sell the route for $12,000. The publisher's actions were later found to violate the Sherman Act and the plaintiff obtained a jury verdict comprised of three elements of damages: (1) plaintiff's lost profits prior to the sale caused by the publisher's competition; (2) the difference between the fair market value of plaintiff's business (with all his customers intact) at the time of the sale and the actual sale price received; and (3) loss of future profits following the forced sale. Id. at 126.[2] In reversing the award of lost profits, the Eighth Circuit explained after an extensive review of cases why such an award was impermissible:

> [N]one of these cases allowed a plaintiff damaged by an antitrust violation to recover both the value of the business as a going concern at the time of the damage and future profits of that business after the time of the damage. The future profits which were allowed in those cases were used as a method of calculating the damage to the value of the businesses involved because no other reliable method of valuing the business was presented. However, in the instant case we have clear proof in the record of the value of plaintiff's business as a going concern, and that value must necessarily take into consideration its future profit-earning potential. Thus, we think that the cases relied on by the defendant, which allow the plaintiff to recover the going-concern value of his business, but not future profits in addition, are applicable to the instant case.
>
> *    *    *

---

[2] The jury awarded damages for three items in the respective amounts of $2,000, $12,000, and $57,000. Id. at 126.

It is our opinion that the plaintiff has received all permissible damages under items one and two, damages occasioned prior to the sale and the full market value on the sale of his route as a going concern, free of the restrictive practices. This value is figured on the basis of his reconstituted route with all 1200 customers. Fair market value would be that price a willing seller could secure from a willing buyer, and the evidence establishes $24,000 as the maximum price obtainable. Plaintiff has thus been made whole on his actual damages [....] He is not entitled to sell the route, receive full compensation therefor, and still receive the profits the route might have made over his reasonable work-life expectancy. The trial judge did cut these damages down to future losses occurring after the sale for a period of three years. We feel this also is duplicitous. The prospect of future earnings is considered in arriving at the fair market value of a given business. Here undoubtedly the value of the route rested not in its tangible assets of an old truck and paper wrapper (valued $600) but in the exclusive contract for distribution of a well regarded newspaper in a given area. Whatever that fair market value might be, plaintiff has received it. Capitalizing and discounting future profits is one method of figuring present value, but this does not mean that a person is entitled to present value plus future profits.

Id. at 131.

To the extent Colorado courts have addressed the question of duplicative damages, they have adopted a view similar to Albrecht. For example, in State of Colorado v. Morison, 148 Colo. 79, 365 P.2d 266 (Colo. 1961),[3] the court addressed the damages recoverable

---

[3] Morison was overruled in part on other grounds by Evans v. Bd. of County Comm. of El Paso County, 174 Colo. 97, 482 P.2d 968 (Colo. 1971).

9

by a farmer whose dairy cows had become diseased through the defendant's negligence:

> [T]he Morisons are admittedly entitled to such special damages as they are able to show with reasonable certainty resulted from defendants' negligence. This would include loss of profits due to diminished milk production from the cows before their sale; the value of silage or feed that became contaminated and therefore unusable; and the reasonable cost of disinfecting the milking equipment, barn facilities, and the farm in general.
>
> However, the Morisons are not entitled to be awarded any sum representing loss of profits for the dairy operation from and after the date of the sale of their diseased cows. Nor are they entitled to be compensated for the loss of the progeny which they could reasonably have expected from the cows. Having received the diminution in their market value[,] to allow these additional items would be a form of double recovery. In other words, fair market value itself reflects, inter alia, the fact that the farm animal may have income producing ability, including the ability to propagate.

A similar approach was taken by the Colorado Court of Appeals in Forsyth v. Associated Grocers of Colorado, Inc., 724 P.2d 1360 (Colo.App. 1986), where a jury had awarded damages to an independent grocer who had to sell his business as a result of a misrepresentation by the defendant. The court of appeals reversed the judgment because the trial court's instruction on damages permitted the jury to award lost profits in addition to an amount awarded to ensure that plaintiff received the fair market value of the business. "Such a result," the court concluded, "would lead to an improper double recovery." Id. at 1365.

10

Numerous jurisdictions hold to the view that "when the loss of business is alleged to be caused by the wrongful acts of another, damages are measured by one of two alternative methods: (1) the going concern value; or (2) lost future profits." Malley-Duff & Assoc. v. Crown Life Ins. Co., 734 F.2d 133, 148 (3rd Cir. 1984). See also Johnson v. Oroweat Foods Co., 785 F.2d 503, 508 (4th Cir. 1986) (the courts allow a plaintiff to recover either the present value of lost future earnings or the present market value of the lost business, but not both). The "going concern value" is the price a willing buyer would pay and a willing seller would accept in a free marketplace for the business in question. Malley-Duff, 734 F.2d at 148. It measures damages by awarding the difference between the going concern value and the price actually received by the plaintiff upon sale of the business. Cf id. This is clearly the measure of damages that was presented by plaintiff's expert in the instant case and it properly supports the consequent award of $35,000 by the jury. The award of lost profit damages in addition to this amount, however, was an improper double recovery.

Plaintiff contends that Atlas Building Products Co. v. Diamond Block & Gravel Co., 269 F.2d 950 (10th Cir. 1959) supports the view that an injured plaintiff can recover lost profits as well as a "diminution in value" of the business. Atlas is distinguishable because the plaintiff in that case continued to operate the business despite the injury. Such a plaintiff might not be made

11

whole by receiving lost profits because the business may be left with assets (e.g., intangible assets such as goodwill) that have less value than before the injury. Such a loss would be realized by the owner upon a subsequent sale of the business. But where the business is sold as a going concern and the owner is awarded the fair market value of the business without the injury,[4] the owner has been made whole because that value takes into account the prospect of future profits as well as the unreduced value of all the business' assets. Cf. Morison, supra (plaintiff could recover profits lost before his cows were sold but not after). Plaintiff also relies on Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., 194 F.2d 846 (8th Cir. 1952), but that case did not arise under Colorado law and thus does not diminish the holdings in Morison and Forsyth, supra. Moreover, we think it clear that the

---

[4] Plaintiff argues that Arnott v. The American Oil Co., 609 F.2d 873 (8th Cir. 1979), supports its position, but upon close inspection it does not. First of all, Arnott recognized that "going concern value" and lost future profits are alternative measures of damage, which necessarily means that it is improper to award both. See id. at 887. Moreover, the court said that the jury in that case could have found that the sale "was a forced sale with no allowance for goodwill or the value of a going business and therefore that [plaintiff] had not received the fair market value of his business." Id. at 887. This analysis in inapplicable to the instant case. The evidence in this case clearly showed that the business was sold as a going concern, with its value arising from the fact that it would continue to operate as an insurance agency. Second, the damage instruction given to the jury in this case told them to award the difference between the actual price received for the business and "the reasonable sale value of the agency's business if the Defendants had not breached the contract." This instruction was clearly designed to ensure that the plaintiff received fair market value for the business.

Eighth Circuit's view of duplicative damages was refined in Albrecht and it is the latter decision which provides guidance on the question before us.

We do not mean to suggest that there can never be an award of lost profits in addition to damages for reduction in the value of the plaintiff's business. As we recognized in Westric Battery Co. v. Standard Elec. Co., 482 F.2d 1307 (10th Cir. 1973), "[i]t is conceivable that there could be capital loss shown in addition to out-of-pocket expenses and loss of profits." Id. at 1317. Such a loss must exist clearly independently of the lost profits, however, and "[t]he jury must be cautioned about duplicative items of damage." Id. Neither of these requirements was satisfied in the instant case. In sum, we conclude that the judgment must be vacated in part because it awards plaintiff an impermissible double recovery.

Not surprisingly, the parties disagree as to what effect a double recovery has upon disposition of the appeal. Plaintiff argues that only the $35,000 award for diminished sale value should be vacated and that the lost profits award should stand, while USF&G argues just the opposite. Although, as indicated above, the "going concern" and "lost profit" measures are generally considered alternative remedies, in this case we conclude that the award of lost profits must be vacated. Just as in Albrecht, here we have "clear proof in the record of the value of plaintiff's business as

13

a going concern, and that value must necessarily take into consideration its future profit-earning potential." Albrecht, 452 F.2d at 129. In fact, plaintiff's expert in this case testified solely to the going concern value and did not make an estimate of lost future profits.[5] Lost future profits may be used as a method of calculating damage where no other reliable method of valuing the business is available, see id., but that was not the case here. Plaintiff has been made whole by receiving the fair market value of the business; he "is not entitled to sell the [business], receive full compensation therefor, and still receive the profits the [business] might have made over his reasonable work-life expectancy." Id. See also R.E.B., Inc. v. Ralston Purina Co., 525 F.2d 749, 754 (10th Cir. 1975) (ability to earn future profits is to be calculated as part of reduction of market value). Moreover, we note that the lost profits award in this case would still be duplicative even if the $35,000 were vacated because the former fails to take into account the additional sum received by plaintiff (over $148,000) for the sale of the business. Thus, the award of

---

[5] Plaintiff did not present a specific estimate of lost profits from any witness but instead relied on the plaintiff's tax returns and the arguments of counsel. Although plaintiff at one point attempted to establish the amount of lost profits through its expert, the trial court sustained an objection to this testimony because it was beyond the scope of the expert's report and designation. Aplt. App. at 232. In addition to its other arguments, USF&G contends that the lost profits award should be vacated because it was based on speculation by the jury. Because we find that the lost profit award must be vacated for other reasons, we do not reach this issue.

14

lost profits cannot stand.

Under the circumstances, we conclude that the proper course is to vacate the portion of the judgment awarding $809,650 in lost profit damages.  The alternative award of $35,000 for diminution in market value is appropriate and is AFFIRMED.  The case is REMANDED to the district court for entry of judgment in accordance with this opinion.