**William H. VON LACKUM, Jr., Appellant,**

v.

**George R. ALLAN, Jr., Appellee.**

**No. 4951.**

United States Court of Appeals, Tenth Circuit.

Feb. 5, 1955.

Rehearing Denied March 16, 1955.

Lowell White, Denver, Colo. (Walter A. Steele, Denver, Colo., was with him on the brief), for appellant.

Samuel J. Eaton, Denver, Colo., for appellee.

Before PHILLIPS, Chief Judge, HUXMAN and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.

This action was brought by George R. Allan, Jr., against William H. Von Lackum, Jr., for damages resulting from an automobile accident. The action was brought under the Colorado Guest Statute.[1] A substantial verdict upon which judgment was rendered was returned for appellee.

By this appeal appellant presents two questions. They are (1) there was not sufficient evidence to show wanton and willful conduct on appellant's part to submit the case to the jury and the court, therefore, erred in overruling appellant's motion for a directed verdict, and (2) the court erred in its instructions to the jury.

Under the Colorado Guest Statute there can be no recovery unless the negligence relied upon consists of "wilful and wanton" disregard of the rights of others. What constitutes willfulness and wantonness is a question of fact and, since each case must to a large extent stand on its own bottom, decided cases are of little aid in resolving this question. Colorado in a number of cases has held that excessive speed alone is not sufficient to constitute willfulness and wantonness, even though the guest has warned the driver of his dangerous speed.[2] In other cases it has held that excessive speed coupled with other factors was sufficient to constitute willfulness and wantonness.[3]

Allan, Tor Westgaard and appellant, Von Lackum, were architectural students at the University of Denver, Colorado. On July 3, 1951, they decided to go to Central City where an opera was being staged. They planned to arrive there about the time the opera was over. They decided to spend some time at Idaho Springs. Westgaard and Allan traveled in Allan's car and Von Lackum followed them in a 1941 Convertible Buick. On the way to Idaho Springs, Allan encountered difficulties which caused him to abandon his car along the roadside. When Von Lackum came along, all three got into his car and proceeded to Idaho Springs, where they remained until about 11:00 p. m. They all three were riding in the front seat of the convertible with the top down. They left Idaho Springs on Highways 40 and 6. When they came to Highway 119, they took it to Central City. The posted speed on Highway 119 from its junction with Highways 6 and 40 to Central City was 40 miles per hour. Von Lackum testified that he traveled 45 miles per hour until he came to Highway 119 and from there on at 40 miles per hour. This testimony, however, is in conflict with all the remaining testimony as well as the physical facts. Westgaard testified that Von Lackum was driving in excess of 60 miles per hour. Allan at one time asked him to slow down since there was a sharp curve ahead but Von Lackum disregarded this

1. Sec. 371, Chapter 16, 1935 C.S.A.

2. Loeffler v. Crandall, Colo., 270 P.2d 769; Millington v. Hiedloff, 96 Colo. 581, 45 P.2d 937.

3. Jaeckel v. Funk, 111 Colo. 179, 138 P.2d 939; Clark v. Hicks, 127 Colo. 25, 252 P.2d 1067; Edelen v. Simpson, 112 Colo. 1, 144 P.2d 986.

warning. Westgaard also told Von Lackum to take it easy, with the same result.

A highway patrolman was parked at the junction of Highways 6, 40 and 119. He saw the Von Lackum car go by at such a high excessive rate of speed as to immediately challenge his attention and cause him to take out in pursuit of this car and another which preceded it. He estimated the speed of the Von Lackum car at 60 miles per hour. The point where the accident occurred was just beyond a long tunnel about 4 miles from the intersection of the highways. Traveling at a speed of from 50 to 70 miles per hour where traffic conditions permitted, the patrolman was unable to overtake the Von Lackum car before it passed through the tunnel. Just as the patrolman was going through the tunnel, he saw the lights of the car flip and the car crash into the mountain side along the highway. The patrolman testified that he was going "pretty fast" at the time and had to set the brakes hard to get stopped.

There were no tire skid marks on the highway showing that Von Lackum had attempted to put on the brakes. This was a curving winding mountain road. The patrolman testified that the longest open space on the road without a curve was a quarter of a mile in length. That Von Lackum was traveling at a fast and dangerous rate of speed is evidenced by the fact that Von Lackum left the road, went through a ditch and crashed into the mountain without apparently any attempt to slow down. The speed of the car is also attested to by the fact that Westgaard was hurled 30 feet from the point of impact and Allan was hurled 71 feet from the point of impact.

When we take into consideration the fact that Von Lackum was well acquainted with this winding curving mountain road, having driven it on a number of occasions, that he was driving at an excessive and dangerous rate of speed according to the testimony of everyone save himself, that he had been warned to slow down but had refused to do so, we cannot say as a matter of law that the facts did not present a case for the jury's consideration.

A more serious question arises with respect to the court's instructions and especially with regard to Instruction No. 5. In this instruction the court instructed the jury that the term " 'negligence' is defined as the failure to observe, for the protection of others, that degree of care, caution and vigilance which the circumstances justly demand; in other words, it is the want of that care and prudence which an ordinarily careful and prudent person would exercise under all of the circumstances of the case. * * *" This is a good instruction on simple negligence but it has no place in this case because under the Colorado Guest Statute no recovery can be predicated upon simple negligence. Recovery can be had only if there is present willful and wanton conduct.

The Supreme Court of Colorado in a number of decisions has frowned upon the giving of such an instruction by trial courts but it apparently has refused to hold that the giving of such an instruction ipso facto constitutes reversible error. The Supreme Court has recently and on the same day decided two cases in which it reversed the judgment because of the giving of an instruction on simple negligence. See Pettingell v. Moede, Colo., 271 P.2d 1038, and Lewis v. Oliver, Colo., 271 P.2d 1055. In the Pettingell case the court said that if the giving of such an instruction in context with the giving of other instructions results in confusion, it will constitute reversible error. And the court pointed out that if trial courts persisted in giving such an instruction "extreme care and caution" is necessary to prevent such confusion. The Lewis case is not of much help. It does not repudiate the doctrine of the Pettingell case. The court merely states that while an adequate instruction on wantonness and willfulness was given, the giving of an instruction on simple

negligence "under the present circumstances was reversible error." [271 P. 2d 1058.] What those circumstances were is not set out in the opinion.

In Instruction No. 2 the court told the jury that under the Colorado Guest Statute a guest had no cause of action against the operator of a vehicle " 'unless such accident shall have been intentional on the part of such owner or operator caused * * *, or by negligence consisting of a wilful and wanton disregard of the rights of others.' " In Instruction No. 3 the court correctly and adequately defined willfulness and wantonness. In Instruction No. 4 the court told the jury that "the mere happening of an accident does not raise any presumption that it was caused by the wilful and wanton conduct of the Defendant." And in Instruction No. 10 the court told the jury that if it found that the defendant was negligent, "it will then be your duty to determine whether or not the defendant's acts in so driving were either willful or wanton as those terms are used in the guest statute and as defined herein." And in a further paragraph of the instruction the court told the jury that it must determine whether the defendant was guilty of negligence which constituted willful and wanton disregard of the rights of the plaintiff.

■ Throughout these instructions the court stressed that mere negligence was not sufficient to impose liability. In clear terms it told the jury that if it found that the defendant was negligent it must further find that such negligence was wanton and willful before the defendant could be held liable. We feel that the court's instructions with regard to willfulness and wantonness meet the test of the Pettingell case and that the giving of the instruction on ordinary negligence did not constitute reversible error.

■■ Appellant assigns error on the use of the terms willfulness or wantonness in the disjunctive in the first paragraph of Instruction No. 10 and urges that both must be found to impose liability. In a subsequent paragraph of Instruction No. 10 the court does use the terms in the conjunctive as it does in other parts of the instructions. We do not think the jury was misled by this. Furthermore, appellant did not except to either Instruction No. 5 or 10 and in light of all the instructions we feel he should not be permitted to raise these questions for the first time on appeal.

Affirmed.

PHILLIPS, Chief Judge (dissenting).

The facts, considered in the light most favorable to the plaintiff, are these: Both Allan and Von Lackum were students in the School of Architecture of the University of Denver. Tor Westgaard was also a student at that school. The three young men went to Idaho Springs on July 3, 1951. Allan and Westgaard traveled part of the way in Allan's automobile. They had a highway accident and traveled the balance of the trip to Idaho Springs in Von Lackum's automobile. They arrived at Idaho Springs about dusk in the late afternoon of that day. They remained at Idaho Springs until about 11:00 p. m. of that day, when they left Idaho Springs in Von Lackum's automobile, which was a Buick Convertible, intending to go to Central City. They traveled from Idaho Springs on U. S. Highway 40 to its junction with Colorado Highway 119 and then turned into 119 and traveled in the direction of Central City. Von Lackum was driving, Westgaard was seated in the middle of the front seat and Allan on the right-hand side of the front seat, slumped down, with his head on the back of such seat. Allan had suffered a knee injury in the earlier accident. Westgaard estimated the speed at which Von Lackum drove at 60 miles per hour. After they turned into Highway 119, they passed State Highway Patrolman Boyce, who was parked in a patrol car on the east side of the highway, headed toward Idaho Springs. A brown colored automobile and the Buick Convertible, with the top down, passed Boyce. The

posted speed and the prima facie safe speed on that portion of 119 from the junction to Central City was 40 miles per hour. Boyce believed that the driver of the brown automobile and Von Lackum were driving at an excessive rate of speed. After a few automobiles had passed him, he turned around and drove in pursuit of the brown automobile and the Buick Convertible. The highway between the junction and Central City is a winding mountain highway. It consists largely of curves of varying degrees, with only a few short, straightaway portions. Boyce testified he traveled between 50 and 70 miles per hour and that he took some of the curves at 50 miles per hour, others at 55 miles per hour and some others at 60 miles per hour. He testified that he did not drive faster than 60 miles per hour on any of the curved portions. He stated that he could not estimate the speed of the Buick Convertible, other than on the basis of his own speed, but that he believed it was excessive. Boyce was able to pass three other automobiles, while engaged in the pursuit, without mishap. The night was clear and the road was dry. Boyce testified that Von Lackum at all times drove in his own lane and that there was nothing wrong with his driving, except that the speed was excessive. After Von Lackum passed through Tunnel No. 1, at a distance of approximately 450 feet from the exit of the tunnel, his automobile left the blacktop portion of the highway, struck the bank on the right-hand side, and turned over on its top. Boyce saw the accident happen, just as he emerged from the tunnel. He was able to stop his automobile before he reached the point of the accident. The impact with the mountain wall on the side of the road was about 100 feet from the apex of the curve. The curve is approximately 14° throughout its length. It is not in any sense a sharp or dangerous curve. The highway between the junction with 40 and the point of the accident may be aptly described as a winding mountain highway with ordinary curves, none of them particularly sharp.

It is obvious that the patrolman drove at 50 to 60 miles per hour, except on a few straightaway portions, and that the distance between him and the Von Lackum automobile was not greater when he started the pursuit and when the accident occurred. This would indicate that Von Lackum drove at a speed of from 50 to 60 miles per hour from the junction to the point of the accident, except on a few short, straightaway portions.

There was no evidence showing what caused the Von Lackum car to leave the road and overturn. None of the occupants of the automobile were able to testify to any specific facts showing the cause of the accident. Photographs taken after the accident showed that the left front tire was flat.

After Von Lackum and his rider guests left Idaho Springs, as they approached a curve on Highway 40, Allan said to Von Lackum, "Better take her easy, Bill; this is a hell of a curve." At another point, while they were traveling on Highway 40, between Idaho Springs and the junction with 119, Westgaard told Von Lackum to take it easy. There was testimony that Von Lackum did not respond verbally to either statement, but there was no testimony one way or the other that he reduced his speed, except Von Lackum's uncontradicted testimony when he was called as an adverse witness by the plaintiff, that he drove slower on the curves than on the straightaway. There was no protest, either by Allan or Westgaard with respect to Von Lackum's speed between the junction with Highway 40 and the point of the accident. At one point Westgaard asked Von Lackum to blow his horn when they entered a tunnel and Von Lackum did so.

The court set out the Colorado Guest Statute and properly instructed the jury thereon.

The court gave the following isolated instruction on simple negligence:

"Instruction No. 5.

"The term 'negligence' is defined as the failure to observe, for the protection of others, that degree of care, caution and vigilance which the circumstances justly demand; in other words, it is the want of that care and prudence which an ordinarily careful and prudent person would exercise under all of the circumstances of the case.

"A failure to do what an ordinarily prudent and careful person would have done under all the circumstances of the case, or doing of something that an ordinarily prudent and careful person would not have done under the circumstances of the case, is negligence."

The court gave no direction to the jury as to how it was to apply Instruction No. 5, although he used the term "negligence" a number of times in other portions of his charge.

The case involves a construction and application of a Colorado statute and Colorado law is controlling.

In the case of Millington v. Hiedloff, 96 Colo. 581, 45 P.2d 937, 938, the court wrote an exhaustive opinion construing the Colorado Guest Statute. The facts, as stated in the opinion, were these: Defendant and May Hiedloff, as her guest, were traveling in an automobile from Coaldale, Colorado to Denver. The road was wet and sleety and quite slippery. They had traveled from Coaldale to Colorado Springs. After leaving Colorado Springs the defendant was in a hurry to get home and drove faster than she had between Coaldale and Colorado Springs. The defendant telephoned her daughter from Palmer Lake, where she and Hiedloff stopped for a cup of coffee and said: "If we have a wreck, you come and pick us up." Mrs. Hiedloff repeatedly asked the defendant not to drive so fast, because the pavement was slick and very slippery. When she asked the defendant to drive slower, the defendant said that she would and she would slow up and then start out fast again. They passed an automobile a short distance out of Sedalia, where the road was slippery, and Mrs. Hiedloff protested against passing the automobile on the slippery road. The defendant replied: "Don't be afraid." After they had driven about a mile further, the defendant lost control of the automobile, resulting in an accident and serious injuries to Mrs. Hiedloff. In construing the statute and holding that there was not sufficient evidence to take the case to the jury under the statute, the court said:

"If the conduct of Mrs. Millington were to be measured by the rule of simple negligence, there was sufficient evidence to carry the case to the jury, but the guest statute, supra, requires more than simple negligence. The negligence required must consist of, or amount to, a willful and wanton disregard of plaintiff's rights. Negligence, in its generally accepted meaning, has in it no element of willfulness; but involves a state of mind which is negative; a state of mind in which the person fails to give attention to the character of his acts or omissions or to weigh their probable or possible consequences. As used in the guest statute, the term 'negligence,' coupled with the elements of willfulness and wantonness, must be construed, not in its commonly accepted sense, but as 'a standard to determine whether there has been culpable conduct. * * * This statute requires that willfulness and wantonness * * * shall be present; * * *. The guest under the statute must take the risk of the driver's simple negligence. She cannot recover on a showing of negligence alone. * * * Willful acts and omissions are conscious acts and omissions; acts and omissions, the possible consequences of which are considered and weighed and present in the mind. To be also wanton acts and omissions they must be of such character or done in such manner or under such circumstances as to indicate that a person of ordinary intelligence actuat-

ed by a normal and natural concern for the welfare and safety of his fellow men who might be affected by them could not be guilty of them unless wholly indifferent to their probable injurious effect or consequences. It will thus be seen that not even every willful act or omission that it is known may subject the guest to possible injury, and that may be the proximate cause of injury to a guest, entitles the guest to a recovery. In addition to being willful, to entitle one to a recovery the conduct must be wanton; such that under the circumstances indicates in and of itself to ordinarily intelligent and considerate persons a disregard for the safety of those liable to be affected thereby, or an indifference to the injurious consequences that may result therefrom.

"The foregoing evidence, being all the evidence on negligence, does not meet the requirements necessary to show willful and wanton disregard of Mrs. Hiedloff's rights. Mrs. Millington, having a grown daughter, evidently was a woman past middle age. She is not shown to have been of a malicious or indifferent disposition toward her sister or to have been heedless of her own safety. She drove carefully until the storm came on. She was in a hurry to get home. When her sister cautioned her to slow up she did so, and then under the urge to reach her destination as soon as possible, and probably unconsciously, would again drive faster. That she drove too fast for safety is obvious in the light of what later occurred. That she intended to drive forty-five miles an hour may be admitted. That she knew this was an unsafe rate of speed under the circumstances does not appear from the evidence. The record does not show there was snow on the pavement, but that forty-five miles per hour on a wet pavement may be a negligent rate of speed under the conditions also may be conceded. Even so, this does not carry the case beyond one of simple negligence. * * * In all the foregoing we see nothing more than an error in judgment of Mrs. Millington as to what the speed of the car might safely be, or, at most, simple negligence. Any accident was as apt to injure the driver as to injure the guest. In fact, when it occurred, both were injured. In any reasonable construction of the evidence the element of intent to disregard the rights of plaintiff and incidentally her own safety does not appear; * * *."

In the case of Pettingell v. Moede, Colo., 271 P.2d 1038, 1042, the court again construed the statute and adhered to the views expressed in the Millington case. In its opinion in the Pettingell case the court said:

"Under the guest statute, the facts must show more than negligence. To willfully and wantonly disregard the rights of others requires a consciousness of heedless and reckless conduct by which the safety of others is endangered. For the purpose of properly construing this statute, ordinary or simple negligence should be considered as resulting from a passive mind, while a willful and wanton disregard expresses the thought that the action of which complaint is made was the result of an active and purposeful intent. Willful action means voluntary; by choice; intentional; purposeful. Wantonness signifies an even higher degree of culpability in that it is wholly disregardful of the rights, feelings and safety of others. It may, at times, even imply an element of evil. One may be said to be guilty of 'wilful and wanton disregard' when he is conscious of his misconduct, and although having no intent to injure any one, from his knowledge of surrounding circumstances and existing conditions is aware that his conduct in the natural sequence of events will probably result in injury to his guest, and is unconcerned over the possibility of such result. The word wanton is defined in Webster's New International Dictionary (2d ed.),

as: 'Marked by or manifesting arrogant recklessness of justice, of the rights or feelings of others, or the like; * * *.' Synonyms given for it are capricious, wayward, spiteful. To be 'wilful and wanton' there must be some affirmative act purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the guest. 'To be so classified, conduct must negative both attention and concern; it must demonstrate indifference as well as inattention ·to consequences which may result.' Fanstiel v. Wright, 122 Colo. 451, 454, 222 P.2d 1001, 1002."

In the instant case, as stated above, Von Lackum, the defendant, drove at a speed of from 50 to 60 miles per hour. If he had driven at a faster speed the highway patrolman would have lost ground, instead of keeping approximately even with the Von Lackum automobile. The prima facie safe speed posted was 40 miles per hour. Von Lackum, according to the patrolman, drove properly in all respects, save speed. As stated above, the curve at the point of the accident was a moderate curve. Von Lackum had already passed much sharper curves without any difficulty, prior to reaching the one where the accident occurred. The traffic was light at the time of the accident, which occurred before the Opera let out at Central City. As far as Von Lackum knew, the automobile was in good mechanical condition. He stated the accident might have been caused by mechanical failure, or a momentary inattention to the road.

I think, under the undisputed facts and circumstances, Von Lackum was guilty only of simple negligence. It seems to me there was nothing to indicate an active and purposeful intent, or an entire disregard of the safety of his guests, or an awareness that his conduct in the natural sequence of events would probably result in injury to his guests or a lack of concern over the possibility of such a result.

In Edelen v. Simpson, 112 Colo. 1, 144 P.2d 986, 987, relied upon by counsel for Allan, the defendant and driver of the automobile was driving with the plaintiff and two other guests in the City of Denver. The defendant drove at speeds of from 35 to 50 miles per hour. All three of his companions warned him of the excessive rate of speed and asked him to slow down. The defendant replied: "I never bumped you off yet and don't intend to now." Thereafter, the defendant undertook to pass an automobile. As he pulled out he saw another automobile approaching from the opposite direction. He did not have time to slow down and fall behind the automobile he was attempting to pass, so he quickly turned his automobile to the left and into a ditch to avoid a collision with the approaching automobile. The right rear tire blew out and the defendant's automobile turned over several times and came to rest 60 feet from the road in a demolished condition. The court construed the defendant's statement, quoted above, as a spirit of bravado, meaning "I'll show you," indicating an intent to disregard the rights of the plaintiff and other passengers. That case, it seems to me, is clearly distinguishable from the instant case. Here, there was no statement by Von Lackum indicating any·purpose or injurious intent to disregard the safety of his guests.

In Clark v. Hicks, 127 Colo. 25, 252 P.2d 1067, the court said:

"The record discloses that Elizabeth Ann Hicks, a minor, one of the defendants in error, was a guest passenger in a car driven by plaintiff in error, Clark. Shortly after eight o'clock P. M. on September 17, 1948, Clark was driving his automobile south on the Denver-Colorado Springs Highway. Approaching a hill on said highway, Clark came upon a truck also proceeding in a

southerly direction on the highway. The truck had seven red lights on the back thereof, which lights were plainly visible and were seen by Clark for some distance. As Clark overtook and attempted to pass the truck, a car operated by one Webster approached from the opposite direction with headlights plainly visible. The highway along which Clark proceeded was marked by a white line in the center, spanned by a double yellow line. A sign erected by the State Highway Department alongside the road, forbidding traffic to cross said yellow line, was seen by Clark when his car was still a considerable distance behind the truck. The truck was proceeding at a comparatively slow rate of speed and Clark testified that at the time he attempted to pass the truck he was driving his car at a speed of between 45 and 50 miles per hour. Plaintiff in error drove his car on his left side of the highway in attempting to pass the truck and actually saw the car driven by Webster approaching on the same portion of the highway. The record discloses that when Clark saw the Webster car approaching he applied his brakes, swerved to the left and again to the right and laid down 151 feet of skid marks on the pavement; that the car swerved to the shoulder of the road and traveled an additional 54 feet, again entered the highway, turned over on its left side and slid into the front end of the Webster car, which vehicle was then proceeding at a speed estimated to be from three to five miles per hour. The Clark car was virtually demolished.

\* \* \* \* \*

"At one place in his testimony, Clark admitted that he was driving 50 miles per hour immediately preceding the accident. He said he could stop his car in 64 feet while traveling 45 miles per hour. It is undenied that after applying his brakes plaintiff in error's car traveled 151 feet on the pavement, another 54 feet on the shoulder of the road, was still going so fast that his auto was on two wheels part of the time; and when he got back on the road his car overturned and slid another 18 feet on its side into the Webster car. Most of this distance was uphill. Whatever the speed of the Clark car, the consequent results clearly demonstrate that it was excessive and beyond the driver's control. His deliberate and conscious conduct, as disclosed by the record, was in violation of the road sign and the yellow markings on the highway. 'Willful acts and omissions are conscious acts and omissions'. Millington v. Hiedloff, 96 Colo. 581, 45 P.2d 937, 939. Under the rule announced in Jaeckel v. Funk, 111 Colo. 179, 138 P.2d 939, and our recent pronouncement in Dameron v. West, 126 Colo. 435, 250 P.2d 592, the trial court did not err in submitting the case to the jury. \* \* \*"

In that case the defendant, conscious that he was violating the prohibition of the double yellow line, and with another automobile approaching, deliberately drove his automobile on the wrong side of the road at an excessive rate of speed. He was guilty of a conscious and a deliberate attempt to pass another automobile in a prohibited area, with another automobile approaching in the lane he entered.

In Dameron v. West, 126 Colo. 435, 250 P.2d 592, which the court characterized as a borderline case, the facts showed that the defendant driver was nervous and upset; that she drove exceedingly fast; that she attempted to pass other automobiles in heavy traffic; that she was aggravated by her guest plaintiff's repeated warnings to drive more carefully. The destination of their journey was Idaho Springs, where they planned to attend a birthday dinner par-

946

ty in honor of defendant's son's birthday. In answer to one protest defendant said: "If we don't get there pretty soon, everything will be eaten up before we get there." The defendant, driving at a speed of over 50 miles per hour down a long and steep hill on a winding road, without using either foot or hand brakes at any time, permitted the automobile to gain such a speed that she lost control of it, with a resulting accident and injury to her guest. There, there was a manifest aggravation at the plaintiff's repeated requests to drive more carefully, indicative of a conscious disregard of the guest's safety. In the instant case, there were no statements by Von Lackum indicating any conscious disregard of the safety of his guests.

See also: Helgoth v. Foxhoven, 125 Colo. 446, 244 P.2d 886; Loeffler v. Crandall, Colo., 270 P.2d 769.

In Pettingell v. Moede, Colo., 271 P.2d 1038, 1043, the court criticized the giving of an instruction on simple negligence in guest statute cases and indicated that such instructions were apt to confuse the jury in distinguishing between simple negligence and willful and wanton misconduct.

In Lewis v. Oliver, Colo., 271 P.2d 1055, 1057, the last expression of the Colorado Supreme Court on the giving of an instruction on simple negligence in guest statute cases, the court said:

"While the court, by instructions Nos. 5 and 8, set out the so-called guest statute and gave a fair instruction thereon, still the instruction on simple negligence was before the jury and it cannot be said that it was not confusing to jurors, not skilled in discerning the true legal effect of instructions, particularly where one is more or less in conflict with the other. The giving of the simple negligence instruction under the present circumstances was reversible error."

I am unable to escape the conclusion that the isolated instruction in the instant case on simple negligence, without a statement connected therewith that such negligence would not warrant recovery and that it was incumbent upon the plaintiff to go further and establish willful and wanton misconduct on the part of the defendant, confused the jury and constituted prejudicial error.

I am of the opinion that the judgment should be reversed and the cause remanded, with instructions to sustain the defendant's motion for judgment notwithstanding the verdict.