**WESTRIC BATTERY COMPANY, a Colorado corporation, Plaintiff-Appellee,**

v.

**STANDARD ELECTRIC COMPANY, INC., a Texas corporation, Defendant-Appellant.**

**No. 72–1734.**

United States Court of Appeals, Tenth Circuit.

Argued and Submitted May 22, 1973.

Decided July 6, 1973.

Rehearing Denied Aug. 1, 1973.

---

Kenneth C. Groves, Denver, Colo., for plaintiff-appellee.

Reed L. Winbourn, of Zarlengo, Mott & Zarlengo, Denver, Colo. (Theo. F. Weiss, of Clemens, Weiss, Spencer & Welmaker, San Antonio, Tex., on the brief), for defendant-appellant.

Before SETH, Circuit Judge, LARA-MORE,* Senior Judge, Court of Claims, and DOYLE, Circuit Judge.

WILLIAM E. DOYLE, Circuit Judge.

This is a products liability case in which the plaintiff Westric Battery Company recovered a judgment based on a jury award in the amount of $472,067.28 from Standard Electric Company, Inc. Liability theories em-

* Sitting by designation.

ployed at the trial were breach of warranty (express and implied), negligence and strict liability. In seeking reversal the appellant stresses the proposition that strict liability was not applicable since the case was not a personal injury one but, rather, was one in which the plaintiff's losses were strictly *property* or business losses resulting from out-of-pocket expenditures, loss of profits and injury to business. It also claimed that the verdict is excessive, and it is further contended that the various damage elements resulted in doubling damages. There are numerous alleged errors, but they generally revolve around the contentions just mentioned.

Westric has been for many years in the automotive and truck battery manufacturing and sales business. One aspect of its business since 1960 has been the furnishing of batteries for golf carts. These were sold to golf and country clubs. The evidence shows that Westric's golf cart battery business has been more productive than the remainder of its business. There is some dispute as to whether the business consistently suffered losses during all the times here in question from the automotive and truck battery business. Standard says it did and that it was bound to ultimately fail. Standard also disputes whether there was any remarkable success in the golf cart battery part of the business. However, the record would indicate that it showed some profit at least until the problem in question commenced.

The relationship between Standard and Westric started in 1960 when the latter commenced purchasing so-called battery separators from Standard. Defendant Standard manufactured its own automotive, truck and golf cart batteries under the trade name of "Reliable" and supplied separators for these under the trade name of "Permalife." About 1957, Westric decided to begin manufacturing golf cart batteries. The president of Westric, Lee Hill, visited the Standard plant in Texas. He was given certain samples of Permalife separators, as well as certain technical brochures, pamphlets and catalogs. He testified that Standard personnel specifically told him that the Permalife separator would be satisfactory for Westric's proposed golf cart batteries.[1]

In late 1960, Westric began manufacturing golf cart batteries utilizing Permalife separators. By 1964 Westric was using Permalife separators exclusively in its golf cart, automotive and truck batteries. From 1960 through about 1966, these batteries performed remarkably; only about one-half of one percent were returned by customers as defective. Westric guaranteed the batteries for full refund or replacement up to ninety days from installation and made an adjustment, by way of credit, for up to two years.

In January of 1967, Standard changed, without notifying Westric, the chemical used as its wetting agent and furthermore removed about twenty percent of the material used in its separator. Thereafter, Westric began to experience a marked increase in battery failures. During the spring of 1968 the return rate reached one hundred percent. Westric sought to discover the cause of these failures, but Standard denied, when questioned by Westric, that its product had been changed or could be responsible for the failures. However, tests conducted by Westric convinced it that the separators were responsible, and so in August of 1968 Westric discontinued purchasing Permalife separators and switched to another brand.

The purpose of the separator is to avoid contact between the positive and

---

1. Westric proposed to utilize a "one-shot" formation process. In the "one-shot" process, a strong sulfuric acid is placed in the battery to create a chemical change in the plates, thereby beginning the flow of electric current. Expert testimony demonstrated that this is an especially sensitive process, requiring components of good quality.

the negative plates in the battery, for if they are not kept separated a short circuit will develop and the plates will fail. Battery plates, positive and negative, are initially made up of lead oxide which undergoes chemical change when sulfuric acid is introduced. In the positive plate the lead oxide becomes lead dioxide. In the negative plate the lead oxide becomes lead. As noted, the separator prevents the positive and negative plates from coming together, whereby a short would be produced. At the same time, the electricity must be transmitted through the separator and for this purpose the separators have a large number of small holes which allow the current to flow through. Also, the separators are coated with a special wetting agent which allows the separator to absorb acid much faster and thus permit the current, which flows by means of the acid, to flow more rapidly.

Plaintiff's evidence from numerous experts, while not entirely consistent, tended to advance the theory that the separators which produced the problem had an excessive number of pinholes together with an unstable wetting agent and that this resulted in contaminating the batteries and causing the positive plate to go soft and fail. Standard, on the other hand, maintained that the fault was in the manufacture and that it derived from allowing the batteries to run down too far which, in turn, damaged the positive plate so that there could never be a full recharge. In any event, the jury obviously found that the separators were defective and there was evidence to support this, and so we need not struggle with the intricacies of chemistry here present. Standard argued their factual theories to the jury, but the jury did not accept them. These we cannot consider. The questions which we are to determine are those legal questions which we have summarized.

## I.
## THE TRIAL COURT'S CHARGE ON THEORIES OF LIABILITY

The trial court instructed the jury on what it considered three different theories, namely, negligence, strict liability of the manufacturer and breach of express and implied warranties.

A. On *negligence,* the instruction was that if the defendant failed to exercise reasonable care in the manufacture of its product and that this negligence was the proximate cause of the plaintiff's suffering damage, that the plaintiff was entitled to recover. The specification was failure to make any tests and inspections of the separators before placing them on the market.

B. In the *express warranty* instruction the jury was instructed that in the buyer and seller relationship, if the seller makes an affirmation of fact or promise orally or in writing relating to the goods, which is a basis for the sale, it creates an express warranty that the goods will conform to the affirmation or promise. A description of the goods which is part of the basis for the sale creates an express warranty that the goods shall conform to the description.

The jury was told that in order for the plaintiff to recover, the jury would have to believe that the defendant expressly warranted either the quality of the product or the testing or inspection thereof; if the jury found that the separators were not as warranted, whereby the plaintiff suffered damages, he would be entitled to recover.

C. The subject of *implied warranty* had two aspects; the court *first* instructed the jury as to the implied warranty that the goods were merchantable. This the court said is implied from the sale. Merchantable was defined as that which would pass without objection in the trade or industry and that it is fit for the ordinary purposes for which it is used.

The *second* part of the charge considered implied warranty and said that

goods are fit or suitable for a particular purpose if the seller at the time he makes the contract of sale has reason to know of any particular purpose for which the goods are required and knows also that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods for that purpose and if the buyer does rely on such skill or judgment.

D. Finally, the court submitted the theory of *strict liability* to the jury. This was defined as applying to a situation in which the seller makes to the public a misrepresentation of the material facts concerning the character or quality of the product sold by him. The court further stated that if the buyer justifiably relies on the statement, he may recover damages suffered if the representation was not true and if it resulted in an injury to the buyer. Thus, "strict liability" was described as a species of commerical misrepresentation.

## II.

### INSTRUCTIONS ON DAMAGES

On the question of damages, the jury was told that it could assess actual damages consisting of out-of-pocket losses incurred in the replacement, refund or adjustment to customers for batteries, the actual cost of the separators during the period in question, the impairment of capital directly flowing from these losses and, in addition, the loss of net profit that the plaintiff could reasonably have earned because of the negligence or breach of warranty or misrepresentations on the part of the defendant. Loss of future profits was also allowed so far as they were natural and probable consequences of the wrongdoing, that is, negligence or breach of warranty or misrepresentation.

## III.

### ISSUES TO BE CONSIDERED

Appellant Standard advances numerous contentions (approximately 37). We do not deem it necessary to consider the vast majority of these. The deter-minative questions, that is, those which appear to have some merit, are (1) the nature of the case is such that all of the theories of liability were appropriately submitted; (2) a particularly important inquiry is whether due to the fact that this is a case in which business injury is alleged, the theory of strict liability should have been given; (3) or stated differently, whether the plaintiff can recover on a strict liability theory where the defendant's only wrongdoing has been the sale of a defective product which has produced property loss.

Other than that, there remains a question whether it was proper to allow the jury to award to the plaintiff all of his out-of-pocket losses from refunds or adjustments together with costs of the separators and at the same time allow him to recover for impairment of capital, that is, overall injury to his business. The propriety of this raises a question because an award of damage for out-of-pocket outlay could well be the same damage suffered from so-called impairment of capital. The question is whether you can recover the out-of-pocket losses and then recover another head of damages for indirect consequences of the losses. Still another area of damage which is to be considered is the allowance of loss of net profits. Thus, under the trial court's formula, the plaintiff is allowed to recover not only the out-of-pocket loss but, in effect, the value of the bargain as well.

## IV.

### LIABILITY QUESTIONS

A. Applicable Law.

 It was assumed at trial that Colorado law was applicable, and indeed the trial judge appears to have applied Colorado definitions as they are set forth in the Colorado Jury Instructions. Apart from the fact that the parties have not been and are not now at conflict on this, it would appear that the applicable Colorado conflicts rule would call for application of the law of the

place of the tort.[2] The Colorado court has not spoken on many of the questions, but evidences have been examined and *Erie* predictions have been made that such doctrines would be applied.[3] The view of the trial judge on this is entitled to great weight. Dallison v. Sears, Roebuck and Co., 313 F.2d 343, 347 (10th Cir. 1963).[4]

**B. Liability Based on Negligence.**

■ Standard concedes that the manufacturer is liable for negligence in turning out a defective product. Standard contends that the court erred in instructing the jury that a manufacturer must make such tests and inspections of its products as are generally recognized as being necessary to create a non-defective product. It is true that Colorado has not expressly embraced the doctrine of MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050 (1916). There are evidences, however, that Colorado would apply this doctrine in a proper case. *See* United States Radiator Corp. v. Henderson, *supra*. *See also* Colorado Jury Instructions, Civil, 14:1 promulgated by the Supreme Court of Colorado, and *see* Colorado Jury Instructions, Civil, 14:2 which states that a manufacturer is duty bound to make reasonable tests and inspections of any components supplied by an outside source "to the end that safety of the finished (article) (product) for the intended or invited use will be reasonably certain." It would follow that the manufacturer having the duty to inspect components has the duty to inspect the finished product.

■ This court has recognized Mac-Pherson v. Buick Motor Company, *supra,* insofar as it establishes the duty on the part of a manufacturer to inspect and discover defects in its products. *See* International Harvester Co. v. Sharoff, 202 F.2d 52, 54 (10th Cir. 1953). This doctrine now has almost universal recognition. *See* 63 Am.Jur.2d Products Liability § 37, and *see* 6 A.L.R.3d 91, 98 (1966). There was evidence in the record that Standard failed to test its separators after 1967 following the change of the chemical composition of its wetting agent. Following the failures experienced by Westric, tests were made and there was evidence that these results were unfavorable, but this fact was not revealed to Westric. This constituted sufficient evidence for submission of the negligence theory.

**C. The Breach of Warranty Theory of Liability.**

The Uniform Commercial Code provisions for sales warranties have been adopted in Colorado. Thus, the Colorado statutes recognize express warranties by affirmation, promise, description and sample, C.R.S.1963 § 155–2–313; implied warranties of merchantability, C. R.S.1963 § 155–2–314; implied warranties of fitness for particular purpose, C. R.S.1963 § 155–2–315.

■ The argument of Standard here is that the evidence does not justify the giving of the instructions on express and implied warranties. We disagree. The several types of warranties coexist.

---

2. Klaxon v. Stentor Electrical Manufacturing Company, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) ; Bannowsky v. Krauser, 294 F.Supp. 1204 (D.Colo.1969). *See, generally,* 63 Am.Jur.2d Products Liability §§ 212, 213, 214.

3. *See, for example,* United States Radiator Corp. v. Henderson, 68 F.2d 87 (10th Cir. 1933), cert. denied, 292 U.S. 650, 54 S.Ct. 860, 78 L.Ed. 1500 (1934) (negligence of manufacturer under Colorado law) ; Schenfeld v. Norton, 391 F.2d 420 (10th Cir. 1968) (warranty and strict liability under Colorado law).

4. We have experienced some difficulty in relating the objections of appellant to the charge because the objections were made to numbered instructions, whereas the paragraphs in the charge are unnumbered. We are limited to consideration of the objections to the charge which have been specifically raised. Union Pacific RR Co. v. Lumbert, 401 F.2d 699, 701 (10th Cir. 1968) ; Von Lackum v. Allen, 219 F.2d 937, 940 (10th Cir. 1955) ; Jones v. Griffin, 216 F.2d 885, 890 (10th Cir. 1954).

*See* Jacobson v. Dahlberg, 171 Colo. 42, 464 P.2d 298 (1970).

The evidence supports the conclusion that Standard disseminated information using advertising materials, trade publications or technical publications and oral statements representing the quality of its separators. This activity qualifies in law as warranties. Norton v. Lindsay, 350 F.2d 46 (10th Cir. 1965).

There was ample evidence also that the excessive number of pinholes coupled with the defective wetting agent rendered the product unacceptable to the industry as failing to satisfy industry standards. Each box of separators contained an advertisement that the separator was immune to the effects of sulfuric acid, a representation which was untrue.

Unquestionably Standard was aware that Westric intended to use the separators for a particular purpose and that Westric relied on Standard's testing and inspecting processes. It is therefore a jury question as to whether Standard knew of Westric's needs and as to whether Westric relied upon Standard's skill in manufacturing a proper product. *See* Wallower v. Elder, 126 Colo. 109, 247 P.2d 682 (1952).

Since there was evidence, even though it was conflicting, as to whether the excessive pinholes coupled with the new wetting agent produced the failures, the question was one for the jury.

### D. The Strict Liability Theory.

As previously noted, the trial court gave an instruction which it called strict liability. The judge described this as liability without negligence or breach of warranty. The elements of the court's charge on this were, first, the making of a misrepresentation of material facts concerning the character and quality of the product sold and, secondly, justifiable reliance upon the misrepresentation.[5] The source of this instruction was § 402B, Restatement of the Law of Torts 2d modified from personal and consumer harm to pecuniary or business loss. Comment *a* to § 402B does call attention to the parallel rule to it, applicable to pecuniary loss resulting from misrepresentation "stated in § 552D," a section which has not yet been published. We regard the issue whether this submission was reversible error as the crucial problem presented.

So far the Colorado Jury Instructions, Civil, 14:5 have applied strict liability to persons and against manufacturers of food and beverages in sealed containers, and this court has expressed its belief that the Colorado court would embrace the concept of strict liability for all products. *See* Schenfeld v. Norton Co., 391 F.2d 420, 425 (10th Cir. 1968).

The early cases applied strict liability only to foodstuffs or products intended for bodily use and were designed to pro-

---

5. The full text of this instruction is as follows:

Ladies and gentlemen, the prevailing law in Colorado, as well as in the State of Texas, is that a manufacturer of a product, such as Defendant here, may be held strictly liable without being guilty of negligence or breach of warranty for the product which he manufactures or sells, but only under the circumstances or conditions which will now be described to you by the Court.

You are instructed that one engaged in the business of selling a product, who, by advertising, labels, or otherwise, makes to the public a misrepresentation of the material facts concerning the character or quality of the product sold by him is subject to liability for damages and losses to a consumer of the product caused by justifiable reliance upon the misrepresentation, even though it is not made fraudulently or negligently.

Therefore, if you find from a preponderance of the evidence that the Plaintiff has established that the Defendant made a misrepresentation of a material fact upon which Plaintiff justifiably relied concerning the character or quality of it product, the separator here in question, in its advertising, literature, brochures, or labels, thereby causing loss and damage to the Plaintiff, then your verdict must be in favor of the Plaintiff and against the Defendant on the complaint. This must be your verdict notwithstanding that such misrepresentation was · not made fraudulently or negligently.

tect persons from hazardous products. One such case which extended liability to an automobile manufacturer on an implied warranty theory was Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960). Our court has had occasion to apply state law in which the tort theory of implied warranty has been utilized. *See* White Motor Corp. v. Stewart, 465 F.2d 1085 (10th Cir. 1972); Speed Fasteners, Inc. v. Newsom, 382 F.2d 395, 398 (10th Cir. 1967); B. F. Goodrich Co. v. Hammond, 269 F. 2d 501 (10th Cir. 1959).

Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1962), is the leading case in modern times for the so-called doctrine of strict liability. In that case Justice Traynor, writing for the California court, formulated a doctrine which was free of warranty requirements, especially the need for privity. The basis for recovery was the defect in design and manufacture which made the product unsafe for its intended use.

Out of the Greenman v. Yuba decision emerged § 402A of the Restatement of the Law of Torts 2d which prescribes a remedy where a consumer is injured by a product sold in a defective condition, unreasonably dangerous to the user or consumer or to his property, and § 402B which holds a seller liable for making a misrepresentation of the material fact concerning the character or quality of the chattel sold by him where the consumer justifiably relies upon the misrepresentation and suffers personal injury. Liability attaches regardless of whether the misrepresentation was fraudulently or negligently made. The trial court in the case at bar carried § 402B beyond its terms so as to allow award of property damages resulting from the misrepresentation.

The California Supreme Court's subsequent decision in Seely v. White Motor Co., 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P. 2d 145 (1965), allowed a purchaser of a defective truck to recover for resulting property damages suffered. He was awarded his previous payments together with lost profits. This recovery was allowed on an express warranty basis. The theory of recovery approved in that case is generally similar to the strict liability theory followed here.[6]

■ We have briefly outlined the history of this in order to furnish some perspective for determining whether the submission of the strict liability theory compels a reversal. The question is whether it introduced a unique theory substantially different from the other submissions and unacceptable so that it could be argued that its adoption by the jury to the exclusion of the other theories constituted error. This speculation would have been obviated had the trial court eliminated some of these theories or required the jury to make a finding as to which theory it was following. We are, however, of the opinion that prejudice is not shown by the appellant on this account because the theory which the court denominated strict liability is not remarkably different from the other theories submitted, particularly the theory of express warranty. In essence it is

6. The California Supreme Court rejected a broader and somewhat more expansive defective product rule which had been enunciated in the New Jersey case of Santor v. A and M Karagheusian, Inc., 44 N.J. 52, 207 A.2d 305 (1965). It is difficult to distinguish between express warranty and the strict liability theory now under scrutiny. *See* Raritan Trucking Corp. v. Aero Commander, Inc., 458 F.2d 1106, 1113 (3d Cir. 1972); Passwaters v. General Motors Corp., 454 F.2d 1270, 1277 (8th Cir. 1972); Basko v. Sterling Drug, Inc., 416 F.2d 417, 427 (2d Cir. 1969); Davis v. Wyeth Laboratories, Inc., 399 F.2d 121, 126 (9th Cir. 1968).

There is a good deal of case law recognizing the liability of the manufacturer for damages following the reliance by purchasers of product sold on the basis of false representations. *See* Baxter v. Ford Motor Co., 168 Wash. 456, 12 P.2d 409; aff'd on rehearing, 15 P.2d 1118 (1932); aff'd on second appeal, 179 Wash. 123, 35 P.2d 1090 (1934); Prosser, The Assault Upon the Citadel, 69 Yale L.J. 1099 at 1134-38 (1960). *Cf.* Helene Curtis Industries, Inc. v. Pruitt, 385 F.2d 841 (5th Cir. 1967).

the same in that both call for a representation. In the case of express warranty there must also be a violation of the representation or promise. In the case of the instant doctrine there must be proof that the representation was false which is in effect a showing of an unfulfilled promise or representation. Apart then from the possible confusion, it cannot be said that the submission of this improvised theory was prejudicial so as to justify a reversal and retrial of this complex lawsuit, for even if the jury employed it in arriving at a verdict, it was not so different so that its use could have introduced prejudicial error. The innovation looms relatively insignificant in relation to the record as a whole. Since Colorado has express warranty in accordance with the Uniform Commercial Code, it is unlikely that the Supreme Court would determine this "strict liability" to be unpalatable.

## V.

### THE DAMAGE PROBLEM

The propriety of the award of items of consequential damages is the final issue. Defendant-appellant contends that the consequential economic losses such as diminution of capital and permanent loss of profits cannot be recovered together with out-of-pocket losses. We

are of the opinion that certain of the items of consequential damage cannot be awarded and were invalidly submitted in this case. To understand the conclusion we reach we must review what occurred.[7]

The jury awarded the sum of $472,067.28. The plaintiff's demands were in the amount of $536,227. The items sought were as follows:

| | |
|---|---|
| Out-of-pocket loss | $132,672.00 |
| Cost of separators | 18,953.00 |
| Loss of profits to the time of trial | 64,402.00 |
| Loss of future profits | 80,200.00 |
| Impairment of the assets of the plaintiff | 240,000.00 |

Exactly how the jury computed the $472,000 plus does not appear and so we are unable to say which of the several items suffered. We put that question to one side and consider the principal issue which is whether all of these elements of damages are valid.

There is evidence upon which the jury could have awarded actual out-of-pocket loss together with lost profits. Testimony was given by Westric's president and accountant on these aspects. They testified as to the amount paid for the defective separators, expenses incurred in attempting to correct the batteries and

7. The charge was conclusory in form. It said:

In assessing such damages, you shall consider the actual out-of-pocket losses incurred by Plaintiff, in the replacement, refund or adjustment to customers for batteries; the actual cost of the separators during the period of time in question; and the impairment of capital directly flowing from those losses, insofar as each of such items have been established by the evidence, and were proximately caused by the negligence or breach of warranty or of misrepresentation of the Defendant.

Ladies and gentlemen, you shall also consider any loss of net profit to date that Plaintiff could reasonably have earned, but did not earn because of the negligence or breach of warranty or misrepresentations on the part of the Defendant. You shall also consider any losses of net business profits in the

future that reasonably could be expected, provided as to these damages you not only find by a preponderance of the evidence that they were and will be a natural and probable consequence of the claimed negligence or breach of warranty or misrepresentations of the Defendant. Also that at the time the products in question were sold to the Plaintiff, the Defendant reasonably could have anticipated from the facts or circumstances that it knew or should have known these damages would probably be incurred by the Plaintiff in consequence of the sale of the products here in question.

On loss of profits, the only limitation was that as to the future they were not to be "speculative, remote, conjectural or imaginary." Thus, in the area of both impairment of capital and loss of profits, the jury was given a more or less free hand.

debts incurred when customers returned batteries which had failed. As noted, these items totaled $151,625.

These witnesses further testified that the golf cart battery division had been showing a net profit of about $16,000 per year prior to 1968, amounts which were lost during 1969 and 1970. The accountant opined that these profits would have continued for five years after the time of trial.

Unquestionably out-of-pocket losses are proper. *See* Parks v. Sullivan, 46 Colo. 340, 104 P. 1035, 1036 (1909), and *see* U. S. Radiator Corp. v. Henderson, *supra*. Similarly, loss of net profits is recoverable if proven sufficiently.[8] We see a problem here, however. While it is in some instances permissible to award loss of future earnings or profits for personal injuries, the rationale for property damage is different from personal loss of earnings. One who is permanently injured is in truth impaired in his ability to produce. On the other hand, property is replaceable and the loss resulting from it is measurable and can only be temporary, whereas they are often regarded as permanent in the personal injury area.

An even more questionable item is that designed to support Westric's claim for recovery for impairment of capital. This is a most unusual item of damage, being measured as it is by a debt and mortgage plus the loss of the assets, the value of which is not even proven. In 1970, Westric made an agreement with its creditors, whereby it gave a third mortgage on its assets which amounted to $240,000. Later Westric defaulted and the creditors foreclosed. Westric claimed that the property pledged had a value of $240,000 and that this was a consequence of its im-

paired economic condition, all of which resulted from the alleged wrongdoing of Standard in furnishing defective battery separators. What this produced, according to its further argument, was a repercussion flowing from the defective separators. How impairment of capital can be measured by the amount of a loan and mortgage is not explained, and we fail to see how it can occur. It is clear though that the $240,000 amount is so disproportionate as compared to the profits from this phase of the business as to itself demonstrate its excessiveness.

It is conceivable that there could be capital loss shown in addition to out-of-pocket expenses and loss of profits. An example which comes to mind is loss of good will. There may be others, but they must clearly exist independently of the out-of-pocket loss. The jury must be cautioned about duplicative items of damage. They must be made aware of the award of out-of-pocket loss and reasonable loss of profits and must limit any capital losses to items which are demonstrated losses and not mere bookkeeping losses. Here the witnesses testified that the creditors agreement was designed to allow Westric to meet its obligations including battery refunds, and so it would appear to have been a marshaling of debts and a composition arrangement. These were ordinary business obligations as is indicated by the list submitted in Exhibit WW. It is not shown that these debts are attributable to the separators, directly or indirectly, and if an effort is made to recover these or to use them as a measure, it inevitably duplicates the out-of-pocket losses which have already been recovered. Unquestionably double or duplicative recoveries are invalid.[9]

8. Lee v. Durango Music, 144 Colo. 270, 355 P.2d 1083 (1960); Lockwood Grader Corp. v. Bockhaus, 129 Colo. 339, 270 P.2d 193 (1954). *See also* DeVries v. Starr, 393 F.2d 9 (10th Cir. 1968); Comet Industries, Inc. v. Best Plastic Container Corp., 222 F.Supp. 723 (D. Colo.1963).

9. Lanfranconi v. Tidewater Oil Co., 376 F.2d 91 (2d Cir.), cert. denied, 389 U.S. 951, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967); W. H. Elliott & Sons Co. v. E. & F. King & Co., 291 F.2d 79 (1st Cir. 1961).

If out-of-pocket loss and loss of profits had not been utilized, Westric could have sought damages based on reduction of its total net worth. This would have been the difference between the total net worth of this business as a whole before the defective separators were supplied and the total net worth of the business after the defective separators had done their damage. It is doubtful whether the appellee would choose this formula in preference to out-of-pocket expenses and loss of profits because this business was at all times a shaky one which had been showing an overall loss for many years. Therefore, this orthodox damage formula had limited capacity to produce a substantial recovery.[10]

It is now apparent that the jury, after awarding damages for actual losses and actual loss of profits, was allowed to speculate in the area of future profits and to consider indirect consequences of all of this on a business which admittedly was shaky and failing.

■ In summary, then, the matter must be retried on the issue of damage, and Westric must carefully formulate its damage theory and must proceed so as to avoid any duplication. Appellant is entitled to be compensated for losses attributable to the injury inflicted, but it is not entitled to earn a profit or necessarily to come out whole because some of its troubles could be attributable to causes other than the defendant's separators. It must be emphasized that it is only the damage flowing legally from the defendant's misdeeds which counts.

## VI.

## INTEREST

■ One final point—the trial court awarded interest as damages from the date of the filing of the complaint. The Colorado statute dealing with interest,

1963 C.R.S. § 41–2–1, provides that in personal injury cases interest commences as of the date of the filing of the complaint. No mention is made of property injuries or torts. Inasmuch as these are unliquidated, the general rule is that the interest commences to run as of the date of judgment. *See* 1963 C.R.S. § 73–1–2. *See* Morland v. Austin, 138 Colo. 78, 330 P.2d 136 (1958), and *see* Holland Furnace Co. v. Robson, 157 Colo. 347, 402 P.2d 628, 631 (1965). *See also* York Plumbing and Heating Co. v. Groussman Investment Co., 166 Colo. 382, 443 P.2d 986, 987 (1968), holding that there can be no recovery on unliquidated claims arising from breach of warranty prior to the entry of judgment. Accordingly, on remand, this interest matter must also be adjusted.

We have examined the additional contentions of defendant-appellant and find them to be without merit.

■ In summary, then, we determine that the diminution of capital item in the amount of $240,000 cannot be sustained either in law or in good conscience. Similarly, the loss of profits for five years after the trial in the amount of $80,200 (demand) is too remote since, as indicated, there is no assurance that defendant would be supplying the defective separators indefinitely or even for five years and thus producing a continued source of damage, whereby the plaintiff would receive a pension. It must mitigate damages.

A remittitur approach has been considered here, but has been rejected as unworkable to both sides. The cause must be remanded for a partial new trial.

The judgment is reversed and the cause remanded to district court for a retrial on the issue of damages, each side to bear its own costs of the appeal.

---

10. Colorado adopted the "benefit of bargain" rule in Otis & Co. v. Grimes, 97 Colo. 219, 48 P.2d 788 (1935). *See also* Farmer v. Norm "Fair Trade" Stamp, Inc., 164 Colo. 156, 433 P.2d 490 (1967) ; Stamp v. Rippe, 29 Colo.App. 185, 483 P.2d 420 (1971).